**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Dale BROWN; Robert Chung; Gussie
Reicher; Rolando Sanchez,
Defendants–Appellants.**

No. 92–4698.

United States Court of Appeals,
Eleventh Circuit.

Jan. 27, 1995.

**620**

Martin A. Feigenbaum, Miami, FL, for Brown.

Ruben M. Garcia, Ft. Lauderdale, FL, for Chung.

Mary Catherine Bonner, Fort Lauderdale, FL, for Reicher.

Fred Haddad, Fort Lauderdale, FL, for Sanchez.

Kendall Coffey, U.S. Atty., Lynne Lamprecht, Miami, FL, for U.S.

Before TJOFLAT, Chief Judge, BLACK, Circuit Judge, and KAUFMAN *, Senior District Judge.

* Honorable Frank A. Kaufman, Senior U.S. District Judge for the District of Maryland, sitting by designation.

1. After carefully considering the other arguments raised on appeal, we conclude that they are without merit and do not discuss them.

BLACK, Circuit Judge:

Appellants Dale Brown, Robert Chung, Gussie Reicher, and Rolando Sanchez challenge their convictions for conspiracy to smuggle cocaine, conspiracy to possess cocaine and, in Appellant Brown's case, two counts of hash oil distribution. On appeal, Brown and Reicher assert two errors related to their entrapment defense. First, they argue that the Government's evidence of predisposition was insufficient as a matter of law, entitling them to judgments of acquittal. Second, Appellants insist that the pattern entrapment instruction given by the district court misstated the law in light of *Jacobson v. United States*, —— U.S. ——, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992), requiring reversal and remand.[1] We affirm.

## I. BACKGROUND

The nature of the entrapment defense requires us to scrutinize carefully the facts of this case. In so doing, we view the facts in a light most favorable to the Government. *United States v. Aibejeris*, 28 F.3d 97, 98 (11th Cir.1994).

The investigation culminating in the Appellants' arrest began on February 22, 1991, when a Government confidential informant named Julio Sanchez (Julio) introduced his co-worker, Dale Brown, to DEA undercover agent Detective Willie Hernandez. In so doing, Julio provided substantial assistance to the Government to reduce his own sentence from a previous narcotics conviction. Julio introduced Hernandez as a well-connected drug dealer interested in purchasing hash oil.[2] According to Government witnesses,[3] Julio was not an agent for Hernandez prior to this investigation and could be trusted to investigate only people already involved in illegal drug activities.

During their first phone conversation on February 22, Brown and Detective Hernandez arranged for the delivery of a hash oil sample to DEA agent Heloise Nydegger,

2. Hash oil is a concentrated, more potent form of marijuana.

3. Julio Sanchez did not appear at trial.

who posed as Hernandez's girlfriend. A few days later, Brown and Julio met with the agents to conduct a one-pound hash oil sale. Brown, Julio, Hernandez and Nydegger met again on March 7. During this meeting, Brown sold six pounds of hash oil to the agents and agreed to use his smuggling operation to bring thirty kilograms of Hernandez's cocaine into Miami in exchange for twenty-five percent of the profits plus one kilogram of cocaine.

At these meetings, Brown related many details about his smuggling operation. Brown smuggled drugs into Miami International Airport through American Airlines (American). His operation required him to pay four people at American, and Brown told agents about the involvement of a Jamaican friend and a girlfriend at American, identified by the Government as Appellants Chung and Reicher, respectively. Brown bragged about importing 200 to 400 pounds of Jamaican marijuana every week. In each meeting with the agents, Brown appeared knowledgeable about the smuggling business, experienced in running a large smuggling operation, eager to expand his extensive business, and comfortable with the transactions.[4]

On March 18, Brown, Hernandez, and Nydegger met again to discuss the logistics of the upcoming cocaine shipment. In several taped phone conversations the next day, Brown and Hernandez negotiated payment details and finalized their preparations for the cocaine shipment on March 21.

The DEA's March 21 dummy shipment to Miami did not arrive as planned. On that day, Detective Hernandez had a series of phone conversations with Brown. The conversations initially concerned details of the pick up, but when it became clear that something had gone wrong, Brown kept assuring Hernandez that "his people" were attempting to locate the shipment. The next day, Brown explained to Hernandez how to "do it right" in the future. He related the particulars of bribing customs and bin switching which enabled him to import marijuana successfully from Jamaica. Plans for a second shipment were made at the meeting and in a subsequent phone conversation.

Appellant Gussie Reicher entered the investigation as one of Brown's contacts at American Airlines. In his discussions with the DEA undercover agents, Brown had made several references to a girlfriend at American. He specifically mentioned a woman who spent all of March 21 looking for the missing cocaine crate. Reicher became involved in this operation on March 21 when Brown called her to look for a crate she initially believed contained marijuana, but later realized contained cocaine.

On March 28, Julio arranged a meeting between Reicher and Hernandez. At the meeting, Reicher told Hernandez that, pursuant to Brown's instructions, she had looked for a crate on March 21. She also discussed receiving $7,000 from Brown for assisting with a previous marijuana shipment. According to Reicher, Brown's operation involved about five people at American Airlines headed by a man named Sanchez. She suggested that Brown's operation was too large and costly and offered to do the job cheaper. Hernandez indicated that he was committed to Brown for the current operation, but was interested in a future arrangement. He also offered to pay Reicher $2,000 to verify the crate's arrival and provide backup services for the upcoming shipment.

Reicher and Hernandez had several taped phone conversations about the upcoming shipment and their proposed business relationship. During one of the conversations, Reicher agreed to guide Hernandez to a location in the airport where he could watch his shipment come off of the plane. On April 2, Hernandez made separate, taped calls to Brown and Reicher concerning the final preparations for a thirty-kilogram cocaine shipment arriving in Miami the next day.

On April 3, Hernandez arrived at the airport and met with Reicher. As they watched American Airlines personnel unload the crate from the designated flight, they continued negotiating for future smuggling business,

---

4. For example, in arranging the thirty-kilogram shipment from Venezuela, Hernandez initially suggested Maracaibo, Venezuela, as the departure point. The next day, Brown said "his people" would agree to handle the shipment if it were shipped from Caracas, not Maracaibo.

with Reicher stressing her price advantage over Brown and Sanchez. Once again, the DEA's shipment disappeared after coming off of the plane.

After the crate's disappearance, Appellants Robert Chung and Rolando Sanchez became directly involved in the investigation. Previous references by Brown and Reicher had already implicated them in the smuggling operation. After learning the shipment was lost, Detective Hernandez paged Brown on his beeper. Brown left work early. He went to Chung's apartment, picked him up, then drove around the Miami area with Chung, stopping twice at Sanchez's house. According to the DEA agents observing Brown, he drove in a manner consistent with a suspect trying to avoid being followed. Eventually, Brown and Chung stopped at a public phone and called Hernandez.

In the taped phone call, Brown introduced Chung as his "key partner." After discussions got heated and Hernandez threatened dire consequences if the shipment did not turn up, Brown put Chung on the phone to assure Hernandez that nobody would cheat them because Chung had a violent reputation. Chung was arrested after Brown dropped him off at home that afternoon.

Reicher was arrested on her way home from work on April 3, 1991. In post-arrest statements, she admitted knowing that Brown and Sanchez ran a marijuana smuggling operation and told the agents about her involvement with the missing crate, her initial belief that it contained marijuana, and her deal for services to Hernandez. Reicher also agreed to make a phone call to Sanchez, during which Sanchez told Reicher that Hernandez should call him. On the phone with Hernandez, Sanchez admitted possessing some of the "stuff" and said that Chung's cousin [5] had picked up most of the shipment. He said he would keep the rest until he received his $5,000 payment.

Brown was arrested shortly after dropping off Chung. He told the DEA that he and Chung were importing thirty kilos of cocaine from Venezuela to Miami. He also discussed the hash oil business and identified his Jamaican source. Brown did not mention Julio in his post-arrest statements.

Sanchez was arrested at home on April 4, 1991. While still in his house, Sanchez made statements admitting his involvement in smuggling cocaine from Caracas to Miami. He told police he agreed to divert the cocaine for $5,000 and claimed the cocaine was delivered to him that afternoon.

A federal grand jury indicted Brown, Chung, Reicher and Sanchez shortly after their arrests. All four were charged with conspiracy to import cocaine into the United States in violation of 21 U.S.C. § 963 and conspiracy to possess cocaine with intent to distribute in violation of 21 U.S.C. § 846. Brown was also charged with two counts of possession of hash oil with intent to distribute in violation of 21 U.S.C. § 841(a)(1). A consolidated trial was held in the Southern District of Florida. Following four days of testimony, the jury found the Appellants guilty on all counts and they were sentenced pursuant to the federal guidelines. This appeal follows.

## II. STANDARD OF REVIEW

■ Entrapment is generally a jury question. *Mathews v. United States*, 485 U.S. 58, 61, 108 S.Ct. 883, 886, 99 L.Ed.2d 54 (1988); *United States v. Costales*, 5 F.3d 480, 487 (11th Cir.1993). Therefore, entrapment as a matter of law is a sufficiency of the evidence inquiry. When an entrapment defense is rejected by the jury, our review is limited to deciding whether the evidence was sufficient for a reasonable jury to conclude that the defendant was predisposed to take part in the illicit transaction. *Aibejeris*, 28 F.3d at 99. Further, a jury's verdict cannot be overturned if any reasonable construction of the evidence would allow the jury to find the defendant guilty beyond a reasonable doubt. *United States v. Ventura*, 936 F.2d 1228, 1230 (11th Cir.1991). Review is *de novo*, but we must view all facts and make all inferences in favor of the government. *Aibejeris*, 28 F.3d at 98.

---

5. The cousin is not a party to these proceedings.

■ We review jury instructions by determining whether the charge, viewed as a whole, sufficiently instructed the jurors so that they understood the issues involved and were not misled about the law. *United States v. Hooshmand*, 931 F.2d 725, 733 (11th Cir.1991). The trial court, therefore, has broad discretion in formulating its entrapment charge, so long as it accurately reflects the law, *United States v. Andrews*, 765 F.2d 1491, 1502 (11th Cir.1985), *cert. denied*, 474 U.S. 1064, 106 S.Ct. 815, 88 L.Ed.2d 789 (1986); *United States v. Walker*, 720 F.2d 1527, 1541 (11th Cir.1983), *cert. denied*, 465 U.S. 1108, 104 S.Ct. 1614, 80 L.Ed.2d 143 (1984), and the precise extent and character of an entrapment instruction will only be reviewed for an abuse of discretion. *United States v. Walther*, 867 F.2d 1334, 1341 (11th Cir.), *cert. denied*, 493 U.S. 848, 110 S.Ct. 144, 107 L.Ed.2d 103 (1989).

## III. DISCUSSION

### A. *Entrapment*

■ A successful entrapment defense requires two elements: (1) government inducement of the crime, and (2) lack of predisposition on the part of the defendant. *Mathews*, 485 U.S. at 61, 108 S.Ct. at 886; *Costales*, 5 F.3d at 487. The defendant bears an initial burden of production to show government inducement. *Ventura*, 936 F.2d at 1230. Once the defendant makes this initial showing, the burden shifts to the government to prove beyond a reasonable doubt that the defendant was predisposed to commit the crime. *Id.*

### 1. Government Inducement

■ A defendant may show government inducement by producing any evidence sufficient to raise a jury issue "that the government's conduct created a substantial risk that the offense would be committed by a person other than one ready to commit it." *Andrews*, 765 F.2d at 1499 (*quoting United States v. Dickens*, 524 F.2d 441, 444 (5th Cir.1975)). This burden is light because a defendant is generally entitled to put a recognized defense to the jury where sufficient evidence exists for a reasonable jury to find in her favor. *Mathews*, 485 U.S. at 63, 108

S.Ct. at 887. Nevertheless, evidence of the government's mere suggestion of a crime or initiation of contact is not enough. *Ventura*, 936 F.2d at 1233. Instead, government inducement requires an element of persuasion or mild coercion. *Id.* (*quoting Andrews*, 765 F.2d at 1499). As the First Circuit has recently observed, inducement consists of opportunity plus something like excessive pressure or manipulation of a non-criminal motive. *United States v. Gendron*, 18 F.3d 955, 961 (1st Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 654, 130 L.Ed.2d 558 (1994).

■ In this case, both Brown and Reicher testified that Julio, the Government's informant, persuaded them to become involved in the charged crime. According to Reicher, Julio coerced her involvement, telling her Brown was in trouble with Columbian drug lords and recruiting her participation in order to save him. A rational jury could have believed Appellants' testimony and found that Brown and Reicher were entrapped. In such circumstances, Appellants met their initial burden of demonstrating Government inducement and the district court properly put the issue of entrapment before the jury.

### 2. Predisposition

The jury in this case received two separate instructions on entrapment but still returned guilty verdicts against Brown and Reicher. Appellants now insist that the Government failed to meet its burden of proving they were predisposed to engage in narcotics smuggling prior to contact by Government agents.

Predisposition was the focus of the Supreme Court's latest entrapment case, *Jacobson v. United States*, —— U.S. ——, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992). In *Jacobson*, the defendant was convicted of receiving child pornography through the mails after a government sting targeted him for purchasing several legal, nudist magazines. *Id.* at —— – ——, 112 S.Ct. at 1537–38. "There followed over the next 2½ years, repeated efforts by two Government agencies, through five fictitious organizations and a bogus pen pal, to explore petitioner's willingness to break the new law by ordering sexually ex-

plicit photographs of children through the mail." *Id.* at ——, 112 S.Ct. at 1538. After reaffirming the basic principles of the entrapment defense, the Court reversed Jacobson's conviction because, "although he had become predisposed to break the law by May 1987, it is our view that the Government did not prove that this predisposition was independent and not the product of the attention that the Government had directed at petitioner since January 1985." *Id.* at ——, 112 S.Ct. at 1541.

The Court divided the government's predisposition evidence into two categories: (1) evidence prior to the sting; and (2) evidence collected during the investigation. *Id.* Evidence in the first category was insufficient because it merely demonstrated a broad, behavioral inclination to buy legal material. *Id.* at —— —— ——, 112 S.Ct. at 1541–42. Evidence in the second category failed to carry the government's burden because it indicated personal inclinations, not any willingness to violate the law. *Id.* at ——, 112 S.Ct. at 1542.

The Court then detailed the twenty-six-month sting, culminating in Jacobson's purchase of two pornographic magazines offered by the government, and concluded that his "ready response to these solicitations cannot be enough to establish beyond reasonable doubt that he was predisposed, prior to the Government acts intended to create predisposition, to commit the crime[.]" *Id.* at ——, 112 S.Ct. at 1543. "Rational jurors could not say beyond a reasonable doubt that petitioner possessed the requisite predisposition prior to the Government's investigation and that it existed independent of the Government's many and varied approaches to petitioner." *Id.* As aptly put by the First Circuit, "the government's evidence did not show how Jacobson would have acted had he been faced with an ordinary 'opportunity' to commit the crime rather than a special 'inducement'." *Gendron,* 18 F.3d at 963.

*Jacobson* does not constitute "an innovation in entrapment law," *Jacobson,* —— U.S. at —— n. 2, 112 S.Ct. at 1541 n. 2, and maintains the Supreme Court's long-held position that predisposition requires a subjective inquiry focused on the defendant's state of mind prior to government inducement. *See, e.g., Sorrells v. United States,* 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932); *Mathews,* 485 U.S. at 67, 108 S.Ct. at 889 (Brennan, J., concurring). In *Jacobson,* the Court wrote that "the fact that officers or employees of the Government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution." *Jacobson,* —— U.S. at ——, 112 S.Ct. at 1540. Even in "a more elaborate 'sting' operation involving government-sponsored fencing where the defendant is simply provided with the opportunity to commit a crime, the entrapment defense is of little use because the ready commission of the criminal act amply demonstrates the defendant's predisposition." *Id.* at ——, 112 S.Ct. at 1541. "Had the agents ... simply offered petitioner the opportunity ... and petitioner—who must be presumed to know the law—had promptly availed himself of this criminal opportunity, it is unlikely that his entrapment defense would have warranted a jury instruction." *Id.*

The preceding passages demonstrate the continued strength of an approach focused on the defendant's readiness and willingness to commit the charged crime. Regardless of the defendant's ability to engage in criminal acts—Jacobson himself might have never seen child pornography but for the government's sting—the prompt commission of the crime at the first opportunity is enough to show predisposition.

Thus, we hold that the predisposition inquiry is a purely subjective one which asks the jury to consider the defendant's readiness and willingness to engage in the charged crime absent any contact with the government's officers or agents. *See Aibejeris,* 28 F.3d at 99 (government must prove beyond a reasonable doubt that the defendant was actually predisposed to commit the crime absent the government's role in assisting such commission). Naturally, the more extensive and involved the government's role, the more difficult it becomes to determine a defendant's independent readiness and willingness to commit a crime until, at some point, it becomes impossible to separate a defendant's independent readiness and will-

ingness from the mental state created by the government.

In her brief, Reicher invites us to use the Ninth Circuit's five-factor analysis enunciated in *United States v. Skarie*, 971 F.2d 317, 320 (9th Cir.1992). We decline the invitation. Predisposition is necessarily a fact-intensive inquiry because it is a subjective inquiry into a defendant's state of mind. Therefore, entrapment as a matter of law cannot be reduced to any enumerated list of factors for a reviewing court to examine. Any list would necessarily be over and under inclusive by omitting factors which might prove crucial to a predisposition inquiry in one prosecution but are totally irrelevant in another. For example, in the instant case, it is significant that the trial evidence reveals Appellants' expertise with the illegal trade. Strict compliance with the *Skarie* factors would simply ignore such potentially dispositive evidence, or force a reviewing court to constantly modify the factors. In the alternative, a jury's finding of predisposition can be tested adequately and can take account of such factors, using the well-established sufficiency of the evidence formula. A fixed list could, at best, provide unsteady guidance and, at worst, be used to invade the province of the jury and unnecessarily complicate a fact-bound, common-sense inquiry.

■■■■ Despite our rejection of any fixed list of factors, several guiding principles emerge from the cases. The government need not produce evidence of predisposition prior to its investigation. *Aibejeris,* 28 F.3d at 99. Predisposition may be demonstrated simply by a defendant's ready commission of the charged crime. *Jacobson,* —— U.S. at ——, 112 S.Ct. at 1541; *Andrews,* 765 F.2d at 1499. A predisposition finding is also supported by evidence that the defendant was given opportunities to back out of illegal transactions but failed to do so. *Ventura,* 936 F.2d at 1231, 1232. Post-crime statements will support a jury's rejection of an entrapment defense. *Andrews,* 765 F.2d at 1499. Existence of prior related offenses is relevant, but not dispositive. *Id.* at 1500. Evidence of legal activity combined with evi-

dence of certain non-criminal tendencies, standing alone, cannot support a conviction. *See Jacobson,* —— U.S. at ——, 112 S.Ct. at 1543. Finally, the fact-intensive nature of the entrapment defense often makes jury consideration of demeanor and credibility evidence a pivotal factor. *See Ventura,* 936 F.2d at 1230.

■■■■ With the foreground principals in mind, we now examine the evidence of predisposition offered in this case. Appellant Brown alleged at trial that Julio induced him to participate in the narcotics business. According to Brown, he had never dealt drugs or had any desire to do so until Julio entrapped him sometime after September, 1990. But this testimony was contested by Detective Hernandez, who testified that Julio was clearly instructed not to entice anyone into drug dealing. Instead, Julio was asked to investigate only those people who approached him first. In addition, Hernandez testified that he trusted Julio. The jury was free to infer that Brown was lying and that Julio, operating under Hernandez's instructions, introduced Brown to Hernandez *after* Brown indicated his desire to sell drugs. The jury could also conclude that Julio was not operating as a Government agent at all and was, therefore, incapable of entrapping anyone. *See United States v. York,* 830 F.2d 885, 889 (8th Cir.1987), *cert. denied,* 484 U.S. 1074, 108 S.Ct. 1047, 98 L.Ed.2d 1010 (1988).

■■■■ An abundance of circumstantial evidence supports the jury verdict. Detective Nydegger testified that at her first meeting with Brown, it appeared as if he "knew exactly what he was doing." When Julio suggested that Brown was eager to meet with "big time dealer" Hernandez, Brown readily agreed. Brown was capable of delivering a hash oil sample on the same day that Hernandez first contacted him. Aside from statements indicating his discomfort with cocaine, as opposed to marijuana or hash oil smuggling, Brown never indicated any reluctance with the smuggling transactions in which he became involved.[6] The preceding

---

6. Appellants cannot claim that they were marijuana smugglers entrapped into cocaine smug-

gling. It is well established that a conviction for smuggling a controlled substance may be sus-

trial evidence indicates that Brown was willing and eager to participate in the crime, from which the jury could appropriately infer his predisposition to smuggle narcotics prior to the commencement of the investigation.

Finally, Brown made many statements in the record which, if credited, provide direct proof of his prior involvement in drug smuggling and dealing activities. At the first meeting between Hernandez and Brown, Brown discussed his connections at the airport and claimed to smuggle 200 to 400 pounds of marijuana into Miami every week. Brown's frequent references to "his people" at American Airlines strongly suggest a large and sophisticated pre-existing operation. Brown also referred to the previous loss of a half-million-dollar shipment of marijuana due to mistakes in the smuggling operation. A reasonable jury could have believed that these statements referred to real events and were not, as Brown claimed at trial, puffery designed to impress Hernandez. The Government's evidence rendered it difficult for a reasonable jury to believe that the investigation was a "set up" by Julio. Clearly, a large and sophisticated smuggling operation is neither easy nor cheap to construct. Evidence that Brown was actually engaged in drug smuggling prior to contact with Government agents would certainly establish his predisposition to engage in smuggling beyond a reasonable doubt.

■ Appellant Reicher insisted at trial that she had never smuggled narcotics in the past and initially helped Brown out of ignorance of the package's content. She claims Julio procured her later assistance by convincing her it was the only way to save Brown's life. But Reicher's own post-arrest statements contradict her claims of initial ignorance and could have been interpreted by the jury as evidence of her prior knowledge of the crate's illegal contents. As with Brown, the jury was free to disbelieve her

tained regardless of whether the defendant had knowledge of the particular drug involved, *United States v. Lewis*, 676 F.2d 508, 512 (11th Cir.), *cert. denied*, 459 U.S. 976, 103 S.Ct. 313, 74 L.Ed.2d 291 (1982), and a defendant may not attack her sentence by claiming she was not

testimony and to rely instead on Hernandez's testimony that Julio could be trusted to follow instructions, not initiate any deals, and investigate only persons already involved in illegal activity.

Other evidence supports the jury's finding that Reicher was predisposed to smuggle narcotics. At her first meeting with Hernandez, she proposed a business arrangement which would have replaced Brown and Sanchez's smuggling operation with her own. The jury could infer from her unwillingness to back out of the allegedly coerced transaction and from her eagerness to make future deals that she was more than willing to smuggle drugs prior to the Government's involvement. Her own post-arrest statements demonstrate knowledge of at least one prior shipment and imply that she realized she was looking for contraband from the moment Brown called on March 21. The totality of the Government's evidence strongly suggests that Reicher was part of Brown's sophisticated smuggling operation long before Julio's alleged entrapment. The jury was free to believe the Government's version of events and conclude that Reicher had engaged in prior smuggling activities and, therefore, possessed the mental state required to find predisposition.

Having carefully reviewed the evidence, we now hold that the Government presented more than enough evidence for a reasonable jury to find that Appellants Brown and Reicher were predisposed to smuggle narcotics prior to the Government's involvement in this case.

### B. *The Entrapment Instruction*

■ Both Brown and Reicher insist that the district court erred by charging the jury with the Eleventh Circuit pattern instruction instead of the supplemental instructions re-

aware of the particular drug involved in the crime. *United States v. Gomez*, 905 F.2d 1513, 1514 (11th Cir.1990), *cert. denied*, 498 U.S. 1092, 111 S.Ct. 976, 112 L.Ed.2d 1061 (1991). Proof of predisposition to smuggle any controlled sub-

quested by Appellants.[7] The district court's instruction read as follows:

> Two of the defendants, defendant Brown and defendant Reicher, assert that they were victims of entrapment concerning the offense charged in the indictment.

> A person is entrapped when he or she is induced or persuaded by law enforcement officials or their agents to commit a crime that he or she had no previous intent to commit, and the law as a matter of policy forbids his or her conviction in such a case.

> However, there is no entrapment where a defendant is ready and willing to break the law and the Government agents merely provided what appears to be a favorable opportunity for a defendant to commit the crime.

> For example, it is not entrapment for a Government agent to pretend to be someone else and to offer, either directly or through an informer or other decoy, to engage in an unlawful transaction with a defendant.

> So a defendant would not be a victim of entrapment if you should find beyond a reasonable doubt that a defendant was ready, willing and able to commit the crime charged in the indictment whenever opportunity was afforded and that Government officers or their agents did no more than offer an opportunity.

> On the other hand, if the evidence in the case leaves you with a reasonable doubt whether a defendant had any intent to commit the crimes except for inducement or persuasion on the part of the Government officer or agent, then it is your duty to find the defendant not guilty.

Appellants maintain that the instruction contains a passage which, standing alone, could lead a juror to overlook the pre-government contact focus of the predisposition inquiry. In the instruction's fifth paragraph, the jury was charged to find that a defendant was not entrapped if they find "that the defendant was ready, willing and able to commit the crime charged in the indictment *whenever opportunity was afforded.*" (Emphasis supplied.) Appellants insist that the "whenever opportunity was afforded" language suggested to the jury that any firm conviction that Brown and Reicher were willing to participate in drug smuggling at any time was sufficient to find predisposition and, therefore, convict.

As *Jacobson* emphasized, predisposition has a definite temporal reference: the inquiry must focus on a defendant's predisposition *before* contact with government officers or agents. *Jacobson*, —— U.S. at ——, n. 2, 112 S.Ct. at 1541, n. 2. This distinction became crucial in *Jacobson* itself. The Supreme Court held that after twenty-six months of government inducement, no rational jury could find Jacobson predisposed to receiving child pornography. *Id.* at ——, 112 S.Ct. at 1543. In other words, all of the circumstantial evidence normally useful to show predisposition was so tainted by the government's extensive and lengthy involvement that no rational jury could believe, beyond a reasonable doubt, that Jacobson was willing to receive child pornography before the government's contact.

A jury instruction cannot be dissected on appeal; instead, we look at the entire instruction when determining its accuracy. *Hooshmand*, 931 F.2d at 733. The instruction's second paragraph defined entrapment as "when he or she is induced or persuaded by law enforcement officials ... to commit a crime *that he or she had no previous intent to commit* [.]" (Emphasis supplied.) This passage made it clear to the jury that predisposition requires an inquiry into the Defendants' willingness to commit the crime before contact with the Government's agents. The instruction's later paragraphs simply illustrated this general definition of entrapment. A reasonable juror could not believe that the later passage changed the pre-contact focus of the initial entrapment definition.

---

stance is enough to defeat an entrapment defense.

**7.** Our holding that the instruction below did not mislead the jury in this case makes it unnecessary to consider the instructions offered by Appellants. *See United States v. Gold,* 743 F.2d 800, 819 (11th Cir.1984), *cert. denied,* 469 U.S. 1217, 105 S.Ct. 1196, 84 L.Ed.2d 341 (1985).

Moreover, the sixth paragraph instructed the jury to acquit if the evidence "leaves you with a reasonable doubt whether a defendant had any intent to commit the crimes *except for inducement or persuasion on the part of the Government officer or agent.*" (Emphasis supplied.) This correctly states the "but for" nature of the predisposition inquiry: If the defendant would not be ready and willing to commit the crime but for the government's involvement, then the defendant cannot be found guilty. Thus, the sixth paragraph correctly communicated to the jury that they could not infer predisposition from any criminal disposition created by the Government. In short, the jury instruction as a whole did not misstate the law of entrapment under *Jacobson. See Jacobson,* —— U.S. at —— n. 2, 112 S.Ct. at 1541 n. 2.

We hold that the entrapment instruction, viewed as a whole, did not mislead the jury into believing that predisposition could arise after contact by Government officers or agents.[8]

### IV.   CONCLUSION

For the foregoing reasons, we hold that the Government's evidence was sufficient for the jury to find beyond a reasonable doubt that Appellants Brown and Reicher were predisposed to narcotics smuggling prior to their contact with the Government's agents. We also hold that the entrapment instruction, viewed as a whole, did not mislead the jury in this case.

AFFIRMED.

---

8.   Nevertheless, it is not difficult to imagine a case where the Eleventh Circuit pattern instruction could mislead a jury. Perhaps in situations like *Jacobson,* where a long and complex government campaign made the defendant's independent state of mind difficult to determine, extra clarity would be required to keep the temporal frame in focus. We further note that other circuits have clarified their entrapment instructions in light of *Jacobson. See Manual of Model Criminal Jury Instructions for the District Courts of the Eighth Circuit,* 419 (West 1994). *See also United States v. Loftus,* 992 F.2d 793, 797 (8th Cir.1993).