[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 9, 2009
THOMAS K. KAHN
CLERK

No. 08-11733
Non-Argument Calendar

_____

D. C. Docket No. 06-60342-CR-KAM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ERIC SCRIVENS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(April 9, 2009)

Before BIRCH, HULL and KRAVITCH, Circuit Judges.

PER CURIAM:

Eric Scrivens appeals his conviction on grounds that the government did not

adequately rebut his asserted entrapment defense and appeals his sentence on grounds that it was unreasonable and that the district court failed to consider fully the sentencing factors. We disagree and affirm.

## I. BACKGROUND

Scrivens was indicted for possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1), 924(e) (Counts 1 and 4); possession with intent to distribute five grams or more of cocaine, in violation of 21 U.S.C. § 841 (Count 2); and possession of an unregistered firearm, in violation of 26 U.S.C. § 5861(d) (Count 3).

At trial, two different versions of events were presented by various witnesses. The prosecution's only witness, ATF Agent Mike Connors, testified to the following:

Based on information from Elijah Clark – a paid, confidential informant – that Scrivens was interested in illegal activity, Agent Connors arranged to meet Scrivens and Clark to try to purchase a firearm. At the meeting, Agent Connors asked if any of the men knew where he could obtain a "hammer," a slang term for gun. Scrivens and Connors then recorded each other's phone number into their cell phones. As Conners was walking away from the meeting, Scrivens phoned him and when Connors said he was looking to get a gun, Scrivens said that

"wouldn't be a problem."

About a week later, Scrivens and Connors arranged to meet, and Clark attended the meeting.[1] Scrivens told Connors that he had a gun that he could sell to Connors. Connors agreed to buy it, and Scrivens said he had to go home to get it. During that conversation, Scrivens and Connors also discussed the possibility of Scrivens obtaining crack cocaine. Connors left to go to their rendevous spot, and a half hour later, Scrivens and Clark arrived, with Clark driving. Scrivens handed the gun wrapped in a plastic bag to Connors through the car window. Scrivens later called Connors to ask if he was happy with the purchase. Connors replied that he was satisfied, and the two agreed to talk again.

The next day, Scrivens and Agent Connors agreed to meet again, this time for Connors to purchase one ounce of crack cocaine from Scrivens. Clark again drove Scrivens to the meeting. The amount Connors received, however, was less than the amount he had arranged to buy and when Connors called Scrivens to complain, Scrivens promised to make it up to Connors in another gun sale.

A few weeks later on April 20, 2006, Scrivens and Agent Connors met again. Clark was not present at this meeting, and Clark had not been involved in

---

[1] The conversations and meetings between Connors and Scrivens were recorded and tapes of those conversations were played for the jury. The taped conversations were consistent with Connors's testimony. The interactions between Scrivens and Clark were not taped.

setting up the meeting. Scrivens said that he was working on a cocaine deal and would let Connors know when he received the drugs. Connors told Scrivens that he was planning a robbery of an armed cocaine transport and was looking for a crew to help him. Scrivens responded that "it wouldn't be a problem, that kind of thing happens every day."

A week after that meeting, Connors had Scrivens ride along with him on a staged gun deal where Connors pretended to sell guns to other undercover agents. Again, Clark was not present at nor was he involved in arranging this meeting. A video of the car ride from that afternoon was shown to the jury, revealing Scrivens stating that he had seen a gun at his friend's house and that he wished he had stolen it. Scrivens also mentioned different people he knew who were selling drugs and stated that all he was looking for was one good "lick," meaning robbery. At one point during the conversation, Connors told Scrivens that if the robbery was not something that Scrivens was interested in that it was fine and to just forget about it. Scrivens replied that he remained interested.

In the six months that followed, Agent Connors and Scrivens talked occasionally. Scrivens changed his phone number and called Connors to give him the new number.

Scrivens called Connors to tell him that he had a sawed-off shotgun to sell,

and they arranged to meet a few days later on October 2, 2006. Connors called Clark to tell him to start hanging around with Scrivens again and be available to provide transportation to Scrivens on the day of the meeting. At the meeting, Agent Connors purchased the sawed-off shotgun and some ammunition from Scrivens.

About one month later, Scrivens contacted Connors and stated that he had recruited another person to participate in the potential robbery. On November 3, 2006, Connors met with Scrivens, Clark, and a third man brought by Scrivens. Agent Connors explained his idea for the robbery of a stash house. During the conversation, Scrivens talked about shooting everyone guarding the stash house. A few days later, Scrivens again initiated a sale of a shotgun to Connors, which Connors purchased.

On November 20, 2006, law enforcement officers arrested Scrivens. Agent Connors advised him of his constitutional rights. Scrivens waived those rights and admitted to selling the firearms to Connors. Scrivens stated that he did not know the names of the people from whom he obtained the firearms, but that he did know it was illegal for him, as a convicted felon, to possess a firearm.

At trial, Scrivens testified on his own behalf. His testimony focused on his relationship with Clark and his assertions that Clark induced him to sell guns and

5

drugs to Connors. Scrivens stated that he was being manipulated by Clark to be the point man, but that Clark was the real impetus behind all the transactions with Connors. Clark would set the price and give Scrivens the guns and drugs to deliver to Connors. When Connors paid him, Scrivens would pass most of the money on to Clark. Scrivens denied mentioning robberies and testified that he had no intent to participate in any robbery. Scrivens testified that he spoke with Connors about guns and drugs because Clark had told him to make Connors think he was a "bad guy." Scrivens admitted that he had three prior felony convictions, including robbery with a firearm.

Scrivens also presented a number of witnesses to testify on his behalf. Clark testified that he met Scrivens shortly before Scrivens began meeting with Connors, but admitted that Scrivens seemed to know him from prison. Clark also testified that he arranged for Scrivens to meet Agent Connors after Scrivens told him that he was "into" robbery. Clark confirmed that he often drove Scrivens to the initial meetings with Connors, but denied pushing Scrivens to sell the guns or cocaine.[2]

In his closing argument, Scrivens asserted that Clark set him up and that he was induced into conducting the gun and drug deals by Clark. The jury instructions included a discussion of an entrapment defense. The jury returned

---

[2] Scrivens also presented testimony of his mother, brother, and ex-girlfriend.

guilty verdicts as to Count 2 (possession with intent to distribute five grams or more of cocaine, in violation of 21 U.S.C. § 841), Count 3 (possession of an unregistered firearm, in violation of 26 U.S.C. § 5861(d)), and Count 4 (possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)). The jury acquitted Scrivens of the firearm possession in Count 1.

The probation office prepared a presentence investigation report ("PSI") and determined the adjusted offense level to be 37, including an adjustment for Scrivens's status as a career offender under U.S.S.G. § 4B1.4. His status as a career offender placed him in a criminal history category of VI. Accordingly, the guidelines range was 360 months to life imprisonment. Count 4 carried a mandatory minimum sentence of 15 years. 18 U.S.C. §§ 922(g), 924(e). The PSI also recommended a two-level enhancement for obstruction of justice, based on the probation office's assessment that Scrivens committed perjury at trial.

Scrivens filed objections to the PSI, disagreeing with the statement of facts and asserting that he was entrapped by the informant.[3] Scrivens objected to the suggested enhancement based on perjury. Scrivens also requested a downward departure because he had already spent 15 years of his life in prison, and he felt

[3] Scrivens acknowledged at the sentencing hearing that these objections to the facts would have "no bearing on the guidelines."

that a lesser sentence would sufficiently reflect the seriousness of the offense.[4]

The district court stated that it "considered the statements of the parties, [] reviewed the presentence investigation and report and [was] fully aware of all the facts and circumstances surrounding the crime." The court overruled Scrivens's objections to the report and denied his motion for a downward departure. The court also denied the government's request for an enhancement for obstruction of justice. The district court adopted the factual findings and guideline applications contained in the PSI and sentenced Scrivens to 360 months' imprisonment as to Counts 2 and 4 and 120 months' as to Count 3, to run concurrently. Scrivens did not object after the sentence was imposed.

## II. STANDARD OF REVIEW

"When an entrapment defense is rejected by the jury, [our] review is limited to . . . whether the evidence was sufficient for a reasonable jury to conclude that the defendant was predisposed to take part in the illicit transaction." United States v. Brown, 43 F.3d 618, 622 (11th Cir. 1995). The review is de novo, but we view all facts and make all inferences in favor of the government. United States v. Francis, 131 F.3d 1452, 1456 (11th Cir. 1997). "[The] jury's verdict cannot be overturned if any reasonable construction of the evidence would allow the jury to

---

[4] Scrivens also objected to the enhancements for having "trafficked in firearms" and for the number of firearms, but withdrew those objections at the sentencing hearing.

find the defendant guilty beyond a reasonable doubt." Brown, 43 F.3d at 622.

We review the reasonableness of a sentence for an abuse of discretion. United States v. Pugh, 515 F.3d 1179, 1188 (11th Cir. 2008).

### III. DISCUSSION

*A. Entrapment*

Entrapment is an affirmative defense involving two elements: (1) the government inducement of the crime, and (2) lack of predisposition on the part of the defendant. United States v. Miller, 71 F.3d 813, 816 (11th Cir. 1996). Once the defendant establishes that the government induced him to commit the crime, "the burden shifts to the government to prove beyond a reasonable doubt that the defendant was predisposed to commit the crime." Brown, 43 F.3d at 623. This inquiry evaluates the defendant's subjective state of mind and "asks the jury to consider the defendant's readiness and willingness to engage in the charged crime absent any contact with the government's officers or agents." Id. Although this court has refused to set out a list of factors by which to judge predisposition, predisposition has been found where the defendant demonstrated ready commission of the charged crime and where opportunities were given for the defendant to back out of the criminal acts, but failed to do so. Id. "[T]he fact-intensive nature of the entrapment defense often makes jury consideration of

9

demeanor and credibility evidence a pivotal factor." Id. (citing United States v. Ventura, 936 F.2d 1228, 1230 (11th Cir. 1991)).

Here, the district court submitted the question of predisposition to the jury, and, according to the verdict, the jury found that Scrivens had not been entrapped. The evidence was more than sufficient to support the jury's finding that Scrivens was predisposed to commit the crimes of which he was convicted. According to Agent Connors's testimony, Scrivens called Connors to arrange the gun sale after their first meeting. Scrivens and Connors met several times, and Scrivens discussed gun and drug deals and expressed interest in committing robbery. At no time did Scrivens demonstrate hesitancy about committing these crimes or express a desire to not participate. Connors gave Scrivens an opportunity to express any unwillingness when he told Scrivens that he did not have to participate in the robbery and could just forget about it. In response, Scrivens reaffirmed his interest in criminal activity. Scrivens's prior convictions for violent crimes, including armed robbery, also demonstrated his predisposition to commit these crimes, especially those related to firearms. See Brown, 43 F.3d at 625 (noting that the "[e]xistence of prior related offenses is relevant" to the government's showing of predisposition in its rebuttal of an asserted entrapment defense).

Although Scrivens testified to a different version of events, the jury was

entitled to conclude that he was not credible and to reject his statements as untrue. See United States v. Rudisill, 187 F.3d 1260, 1268 (11th Cir. 2008) (noting that a defendant who testifies runs the risk that the jury might not believe his testimony); see also United States v. Vazquez, 53 F.3d 1216, 1225 (11th Cir. 1995) ("[W]hen a defendant takes the stand in a criminal case and exposes his demeanor to the jury, the jury may make adverse determinations about his credibility and reject his explanation as a complete fabrication."). The testimony of Agent Connors and Clark, as well as the corroborating recordings of the conversations between Scrivens and Connors, provides sufficient evidence to support the jury's assessment that Scrivens was not entrapped.

*B. Sentencing*

We "measure the 'reasonableness' of a given sentence against the factors outlined by Congress in 18 U.S.C. § 3553(a)." Pugh, 515 F.3d at 1188; see United States v. Talley, 431 F.3d 784, 788 (11th Cir. 2005) ("We must evaluate whether the sentence imposed by the district court fails to achieve the purposes of sentencing as stated in section 3553(a).").

A district court's imposition of a sentence must be both procedurally and substantively reasonable. United States v. Gonzalez, 550 F.3d 1319, 1323 (11th Cir. 2008). A sentence may be procedurally unreasonable where the court failed to

11

calculate properly the guidelines range, treated the guidelines as mandatory, failed to consider the § 3553(a) factors,[5] selected a sentence based on clearly erroneous facts, or failed to adequately explain the chosen sentence.  Gall v. United States, — U.S. —, 128 S.Ct. 586, 597 (2007).  "[S]ubstantive reasonableness involves examining the totality of the circumstances, including an inquiry into whether the statutory factors in § 3553(a) support the sentence in question."  Gonzalez, 550 F.3d at 1324.  "[T]he party who challenges that sentence bears the burden of establishing that the sentence is unreasonable in light of both [the] record and the factors in section 3553(a)."  Talley, 431 F.3d at 788.

In this case, the sentence was procedurally and substantively reasonable. Scrivens has not shown any error in the imposition of his sentence.  The sentencing guidelines range was accurately calculated and the imposed sentence was within the guidelines range.  The district court stated that it had "considered the statements of the parties, [] reviewed the presentence investigation and report and [was] fully aware of all the facts and circumstances surrounding the crime."  This statement sufficiently demonstrates that the district court considered the guidelines

---

[5] Under § 3553(a), a district court should consider, inter alia, the nature and circumstances of the offense, the history and characteristics of the defendant, the available kinds of sentences and the sentencing range established in the guidelines, the need to avoid unwarranted sentencing disparities among similarly situated defendants, and the need to reflect the seriousness of the offense, to afford adequate deterrence to criminal conduct, and to protect the public.  See 18 U.S.C. § 3553(a)(1)-(7).

range and § 3553(a) factors, including the facts of the case and the defendant's history. See United States v. Scott, 426 F.3d 1324, 1329 (11th Cir. 2005) (noting that the district court is not required to state on the record that it has considered the § 3553 factors nor expound upon each individual factor).

Additionally, we conclude after a thorough review of the record and the defendants' criminal history that the sentence imposed was substantively reasonable. Scrivens qualified as a career offender and had prior convictions involving firearms. In this case, Scrivens was convicted of selling guns and drugs to an undercover agent and the record showed that he expressed a willingness to commit a robbery that would likely include further violence. The court imposed a sentence at the low end of the guidelines range, and Scrivens has not demonstrated that his sentence is unreasonable in light of the § 3553(a) factors.

## IV. CONCLUSION

For the foregoing reasons, we **AFFIRM** Scrivens's conviction and sentence.