[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-10473
Non-Argument Calendar

_____

D.C. Docket No. 6:15-cr-00158-GKS-TBS-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CARL JOSEPH THOMAS PISA,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(July 5, 2017)

Before HULL, JULIE CARNES and JILL PRYOR, Circuit Judges.

PER CURIAM:

After a jury trial, Carl Pisa appeals his conviction for possessing firearms, that is, destructive devices as defined by 26 U.S.C. § 5845(a)(8) and (f), that were not registered in the National Firearms Registration and Transfer Record, in violation of 26 U.S.C. §§ 5861(d) and 5871.  At trial, the government presented evidence that Pisa sold to an undercover law enforcement agent twelve professional-grade mortars that had been altered by cementing metal BB pellets to the outside and wrapping the pellets with tape.  On appeal, Pisa challenges: (1) the sufficiency of the government's evidence; and (2) the trial court's denial of his request for an entrapment jury instruction.  After review, we affirm Pisa's conviction.[1]

## I.  SUFFICIENCY OF THE EVIDENCE

A person is prohibited from receiving or possessing a firearm that is not registered to him in the National Firearms Registration and Transfer Record.  26 U.S.C. § 5861(d).  The term "firearm" is defined broadly and includes a "destructive device."  Id. § 5845(a)(8).  The term "destructive device" includes "any explosive, incendiary, or poison gas (A) bomb, (B) grenade, (C) rocket having a propellant charge of more than four ounces, (D) missile having an explosive or incendiary charge of more than one-quarter ounce, (E) mine, or (F) similar device."  Id. § 5845 (f)(1).  The definition of "destructive device" excludes

---

[1]Pisa does not appeal his sentence.

"any device which is neither designed nor redesigned for use as a weapon." Id. § 5845(f). Thus, to sustain a conviction under § 5861(d) where the firearm is a destructive device, the government must prove both that the device was an explosive and that it was designed as a weapon. United States v. Hammond, 371 F.3d 776, 780 (11th Cir. 2004). "[T]he critical inquiry is whether the device, as designed, has any value other than as a weapon." Id. at 781. The presence of design features that eliminate any claimed benign value supports a finding that the device was designed as a weapon. Id.

With respect to mens rea, the government need not establish that the defendant knew the firearm in his possession had to be registered. United States v. Owens, 103 F.3d 953, 956 (11th Cir. 1997). Instead, the government must prove that the defendant knew that the device he possessed had the characteristics that brought it within the statutory definition of a firearm. United States v. Miller, 255 F.3d 1282, 1286 (11th Cir. 2001). In other words, the government must prove that the defendant was aware of the features that subjected the device to registration, but the government is not required to prove that the defendant knew what features meet the statutory definition of a "firearm." United States v. Ruiz, 253 F.3d 634, 638 & n.4 (11th Cir. 2001).

Here, the government's evidence showed that the twelve altered mortars were "destructive devices" and therefore firearms that were required to be

3

registered.[2]  Specifically, the government presented evidence that the mortars were originally commercial aerial shells used in higher-end fireworks displays like those seen at Disney theme parks.  The evidence also showed that a person would need both state and federal permits to possess this type of commercial pyrotechnic.  The inside of the mortars contained two components—flash powder, an explosive that creates a flash of light and loud noise, and black powder, an explosive that is generally used as a propellant.  Aside from the regular pyrotechnic mortar, the devices had copper-coated steel BB pellets glued to their surfaces and then covered with multiple layers of blue masking tape.

The Consumer Product Safety Commission and the American Pyrotechnics Association prohibit the use of metal in the production of fireworks as a safety hazard.  The mortars had been modified by the presence of the metal BBs and no longer functioned as designed.  The metal BBs attached to the outside of the mortars were a form of shrapnel that, when the device was detonated, would travel at the speed of 2,500 to 3,500 feet per second and would be able to penetrate a human body.

Pisa asserts that the government never tested the devices to determine whether they were "anything but fireworks to which ball bearings had been

---

[2]We review the sufficiency of the evidence de novo, viewing the evidence in the light most favorable to the government and drawing all inferences in favor of the jury's verdict. United States v. Ramirez, 426 F.3d 1344, 1351 (11th Cir. 2005).

cemented." To the contrary, the government presented evidence that investigators sent several of the devices to a laboratory to determine how they functioned. Two devices were detonated to observe the effects, which included BBs penetrating through quarter-inch drywall and destroying a concrete block. Further, an explosives expert with the Bureau of Alcohol, Tobacco, Firearms, and Explosives who disassembled some of the shells testified that the attached BB pellets meant that the fireworks had no value other than as a weapon and that the altered mortars fit the characterization of an explosive bomb.

As to mens rea, Pisa argues that the government failed to prove he knew of the specific features that made the mortars destructive devices. We conclude that the government presented ample evidence from which the jury could find that Pisa knew about features of the mortars that made them explosives that were designed as weapons—the attached metal BB pellets. See Hammond, 371 F.3d at 780.

At the time of the sale, Pisa told the undercover agent in a recorded conversation that he made the devices, explaining, among other things, that he attached the metal BBs with cement and then wrapped the devices in tape and that he had to "glove up" and discharge static electricity from his body before making them so they would not blow up in his face. Moreover, Pisa knew that the BBs could cause substantial damage to persons or property, as he explained to the undercover agent that he had detonated one of the devices and that the BBs had

5

blasted out in a perfect cone, causing significant damage to a "heavy-duty" dumpster. Pisa also assured the undercover agent that the devices could kill a person, explained that the devices could be set up as booby traps using a trip wire, and offered to text the undercover agent written instructions on how to do so.

Pisa contends that he did not know precisely what was inside the mortars because he did not make them. Before the sale, however, Pisa informed the undercover agent that the mortars were "professional-grade report mortars" used for fireworks displays, that he could not "crack them open" to add shrapnel to them because it was too dangerous, but that "[t]hings can be hot glued to the outside like nails and ball bearings." This is exactly what Pisa told the undercover agent he did to the mortars when they met two days later to conduct the sale. The government's evidence was more than sufficient to show that Pisa was aware of the features of the altered mortars that made them "destructive devices" within the meaning of 26 U.S.C. § 5845(f)(1).

## II. ENTRAPMENT INSTRUCTION

Pisa argues that the district court erred when it denied Pisa's requested jury instruction on entrapment. We find no error because, given the evidence presented at trial, Pisa was not entitled to an entrapment instruction.[3]

---

[3]Although this Court typically reviews a district court's refusal to give a requested jury instruction for an abuse of discretion, it is unclear whether we review a district court's decision not to give an entrapment instruction based on the defendant's failure to produce sufficient

The defense of entrapment has two elements: (1) the government's inducement of the crime; and (2) the defendant's lack of predisposition to commit the crime before the inducement. United States v. Orisnord, 483 F.3d 1169, 1178 (11th Cir. 2007). To be entitled to present an entrapment defense to the jury, the defendant bears the initial burden of production as to the element of governmental inducement. United States v. Sistrunk, 622 F.3d 1328, 1333 (11th Cir. 2010). If the defendant meets his initial burden of production, the burden shifts to the government to prove beyond a reasonable doubt that the defendant was predisposed to commit the crime. Id. The sufficiency of the defendant's evidence of governmental inducement is a legal issue to be decided by the trial court. Id. at 1332-33.

A defendant can show inducement by producing evidence sufficient to create a jury issue "that the government's conduct created a substantial risk that the offense would be committed by a person other than one ready to commit it." United States v. Brown, 43 F.3d 618, 623 (11th Cir. 1995) (quotation marks omitted). The defendant meets this burden if he produces evidence that the government's conduct included some form of persuasion or mild coercion. Id. For example, the defendant may show persuasion with evidence that he "had not

---

evidence of governmental inducement de novo or for an abuse of discretion. See United States v. Sistrunk, 622 F.3d 1328, 1333 (11th Cir. 2010) (collecting cases). We need not decide the issue here because, under either standard, the district court properly denied the instruction.

7

favorably received the government plan, and the government had to 'push it' on him, or that several attempts at setting up an illicit deal had failed and on at least one occasion he had directly refused to participate." United States v. Ryan, 289 F.3d 1339, 1344 (11th Cir. 2002). The government's mere suggestion of a crime or initiation of contact is insufficient to demonstrate inducement. Brown, 43 F.3d at 623.

Here, the district court did not err in refusing to give Pisa's requested entrapment instruction because Pisa failed to carry his initial burden to show government inducement. Pisa did not present any evidence at trial and instead relies on the government's evidence to meet his burden. Pisa emphasizes that the undercover agent initiated contact with him, but government initiation of contact does not show inducement. See id. Furthermore, the undercover agent contacted Pisa only after finding Pisa's Facebook advertisement offering to sell a military ground simulator, an explosive device normally used by the military in training. When Pisa met with the undercover agent to sell the simulator, Pisa explained to the agent how the simulator could be used as a booby trap by wiring the device to a trip board. Pisa also stated that he would be able to obtain additional explosive devices for the undercover agent. Moreover, when Pisa next met with the undercover agent, Pisa explained that he could attach flechettes or other shrapnel to the explosive devices. Pisa further explained that putting the flechettes inside the

devices could help the undercover agent avoid arrest if he was pulled over, because the devices would look like ordinary fireworks.  Pisa did not express any hesitancy to sell the explosive devices to the undercover agent, despite the agent's repeated insinuation that he and his "brothers" wanted to use the devices to set up booby traps that could harm people.  To the contrary, Pisa confirmed that the devices could kill a person, explained to the undercover agent how to set up the device as a booby trap, and offered to send the agent instructions.

Pisa asserts that he expressed hesitancy when he at one point told the agent to seek explosive devices from another source.  Specifically, at their first meeting, the undercover agent told Pisa he was looking for explosive devices to use as booby traps that could do damage to people.  Pisa discussed possible options with the agent and agreed to try to find something for the agent.  When Pisa had no success after about a month, the undercover agent texted Pisa stating that he needed the explosive devices soon and asked whether he should look elsewhere. Pisa responded: "Yea[h] man, see what you can find around besides me.  I've been traveling around hard and haven't had the time to get together with my guy [who makes explosive devices] for anything I ordered.  I'm all the way in Miami for the next week and won't be back around Orlando until next week."

During this exchange, as with all of their interactions, Pisa did not express any discomfort with the criminal activity; instead, Pisa merely advised the agent

9

that because of his travel plans, he could not deliver the devices to the agent quickly. Furthermore, when they communicated again a few weeks later, Pisa readily told the agent he now had some explosives to sell, and the two arranged to meet. Viewed in context, Pisa's suggestion that the agent find another source did not indicate reluctance by Pisa to engage in the criminal conduct. See United States v. Parr, 716 F.2d 796, 803 (11th Cir. 1983) (rejecting defendant's argument that his statement to "forget the whole thing" showed his hesitancy to engage in the criminal scheme because the statement appeared to have been made in frustration in response to a codefendant's erratic behavior).

Finally, as the government notes, Pisa was charged here only with possessing the unregistered destructive devices, not selling them. The undercover agent did not direct Pisa to find professional-grade mortars; Pisa first obtained the mortars and then reached out to the agent to determine if he had any interest in purchasing them. Moreover, when the undercover agent asked about attaching shrapnel to the mortars, Pisa readily agreed and never expressed any hesitancy to alter the mortars. Thus, Pisa failed to show that the government induced him to commit the crime, and an entrapment instruction was not warranted.

Accordingly, for these reasons we affirm Pisa's conviction for possessing unregistered firearms.

**AFFIRMED.**

10