United States Court of Appeals,

Eleventh Circuit.

Nos. 94-4344, 94-4346, 94-4347 and 94-4366.

UNITED STATES of America, Plaintiff-Appellee,

v.

Tam WAI-KEUNG, Sun Cheung, Raymond Ching, and Li Chi-Cheong, Defendants-Appellants.

June 20, 1997.

Appeals from the United States District Court for the Southern District of Florida. (No. 93-61-CR-Mishler), Jacob Mishler, Judge.

Before TJOFLAT and BARKETT, Circuit Judges, and GODBOLD, Senior Circuit Judge.

PER CURIAM:

Defendants pleaded guilty to RICO and RICO conspiracy for a scheme in which, using phony credit cards, they made large purchases of expensive goods from luxury stores in the Miami vicinity. The detailed facts are set out in the decision of the district court denying motions to suppress, *U.S. v. Wai-Keung,* 845 F.Supp. 1548 (S.D.Fla.1994), and need not be repeated here.

Defendant Li Chi-Cheong was granted leave to appeal from denial of his motion to suppress on two grounds: lack of probable cause to arrest, and the taking of his statement allegedly in violation of *Miranda.*

The district court did not err in holding there was probable cause to arrest Li. Agent Cachinero made the arrest. He was experienced in credit card fraud and had been trained by the Secret Service in identification of fraudulent cards. He was assigned to the access device fraud squad in the Miami office of the Secret Service.

In early January 1993 Cachinero learned of an investigation in West Palm Beach of Asian males posing as rich businessmen and purchasing high-end items with fraudulent credit cards. On January 12 Cachinero responded to a call from a jeweler in the Bal Harbor Mall. The store clerk had noticed that an Asian male wanted to purchase two expensive watches with a credit card. The clerk, who knew of the West Palm Beach investigation, became suspicious. When the clerk attempted to verify the card the suspect fled, leaving behind a fraudulent credit card and fake license.

Cachinero next learned, from representatives of other Bal Harbor Mall stores, of an organized gang of Asian men using fraudulent credit cards to purchase expensive merchandise. According to clerks at one of the victimized stores the men operated in pairs, with one of the pair presenting the credit card and the other standing inconspicuously in the background.

Cachinero also spoke with a fraud investigator for MasterCard, who confirmed that there was an organized ring of Asian males victimizing local stores with fraudulent credit cards.

On January 28 Cachinero received a call stating that there were four Asian men in the Saks store at Bal Harbor, making large purchases using credit cards, some of which were being rejected, and that the men fit the *modus operandi* described above. Cachinero came to Saks. The suspects had departed, but he was shown a videotape of them. It showed two Asian men at one counter and two at another. And it showed at one counter a person purchasing merchandise, then furtively handing something to a stocky heavyset man nearby. The two men at the other counter were making large purchases with credit cards.

Cachinero thought the behavior of the four individuals was suspicious, in part because of the hand-off of an object from one man to the other, and because the men appeared nervous, and because they fit the profile of the Asian group that had been involved in previous incidents.

Cachinero was advised by an off-duty policeman at the mall that four Asian men were making large purchases in another store. Cachinero entered that store and saw three men he had not seen before in the company of the stocky, heavyset man that he had earlier seen. The other three men present were defendants Li, Sun and Tam. Sun was at the counter. Tam and Li were "browsing among the merchandise." Tam held up a shirt and talked to Li about it. The heavyset man sat in a chair facing the mall acting, according to Cachinero, as a lookout. Cachinero approached the counter at which Sun was standing and observed him utilizing a credit card that he could see was false. While the charge for Sun's purchase was being processed all four defendants went outside and smoked and talked among themselves. They re-entered, Cachinero saw Sun sign a credit card receipt, and the cashier then handed a bag of merchandise to someone in the group. The four men left together.

The heavyset man was seen to leave the others, and Li, Sun and Tam proceeded to another store. There the three of them were observed at the cashier's counter standing next to each other. Sun signed what appeared to be a credit card receipt; Tam and Li were next to him when he did so. A bag of merchandise was handed to one of the three.

Cachinero approached the three defendants, identified himself as a Secret Service agent, and asked for identification. Sun produced a driver's license and credit card, both appearing to be phony. Li produced a Florida driver's license in his name. He had no credit cards. Cachinero took the three into custody.

The district court did not err in concluding that there was probable cause to arrest Li. Li does not deny that he was part of the group, the members of which were acting illegally, and it cannot be inferred from the evidence that he was not a member. He talked to Tam, stood next to members utilizing phony cards, left one store with the group when they went outside to smoke and talk while a charge was being processed, and re-entered with the group. The group was a multi-person operation, following a methodology previously identified, composed of persons of similar identity (Asiatic males), operating in similar sites (luxury stores) and doing the same thing (purchasing high-level items with fake credit cards). There is no basis on which it can be concluded, as Li suggests, that he was just waiting while others purchased merchandise or just watching them make purchases.[1]

Li relies upon *Swint v. City of Wadley,* 5 F.3d 1435 (11th Cir.1993). In that case a confidential informant entered a club and was sold drugs by a patron. The informant signaled for a raid and search to begin. The seller was arrested immediately but persons inside the club were prevented from leaving until the raid, which lasted one to one-and-a-half hours, was over. During a second raid the seller could not be found and no arrest was made, but people inside the club were

---

[1]While it is not relevant to the probable cause determination, subsequent events verify Li's culpability. When he was arrested Li told Cachinero that he had come to the mall by bus. As it turned out his rental car was parked across the street. Li claimed to have been hired merely to drive the defendants around and asserted that he had not used any of the credit cards or received any of the proceeds. He admitted, however, that he knew that something was wrong with the credit cards and knew that they did not belong to defendant Sing, who was one of the persons using them.

held at gunpoint and told to lie on the floor during the raid, which again lasted from one to one-and-a-half hours. Two night club owners, an employee and a patron sued the officers. The court affirmed the denial of qualified immunity to the officers. They did not have arguable cause to conduct extensive raids, searches of the premises, or seizure of patrons, as there was no evidence that persons in the club were involved in illegal activity except for the seller of the drugs. Search and seizure of one suspect, the seller, in a public place could not be bootstrapped into the probable cause for a broad based search of the business and its patrons. 5 F.3d at 1444.

In the present case Cachinero's observations and corroborated tips supplied the requisite link between Li, the other defendants, and their credit card fraud scheme. Li was a member of the group, all members of the group including Li were suspected of engaging in criminal activity based on their activities at the Bal Harbor Mall. Other defendants were not suspected of these crimes independently of Li but as group participants. Cachinero had evidence from his own observations, an informant and the store video.

*U.S. v. Gonzalez,* 969 F.2d 999 (11th Cir.1992) dealt with the effect of an officer's mistaken belief of fact on his determination of probable cause. The court remanded to the district court for a determination of whether the officer's belief that defendant acted as a lookout for a drug transaction was reasonable despite the officer's misidentification of her. No mistake of fact (i.e. of misidentification) influenced the agent's determination of probable cause to arrest Li.

Li raises the validity of the search of his rental car. This is not one of the grounds upon which he was granted leave to appeal, therefore it cannot be considered.

With respect to all appellants, the court did not err in calculating the amount of intended loss. *U.S. v. Toussaint,* 84 F.3d 1406 (11th Cir.1996). The district court arrived at a loss of $2,500,000, by adding the number of completed false cards, unembossed cards, signature panels, other unembossed cards found in a safe in the hotel where some of defendants were staying, and a list of account numbers. These were "access devices." The total number was multiplied by the $6,900 average amount charged per account during the two weeks prior to defendants' arrest. Use of averaging to calculate loss is acceptable. *U.S. v. Koenig,* 952 F.2d 267 (9th Cir.1991); see also

*U.S. v. Lohan,* 945 F.2d 1214, 1218-19 (2nd Cir.1991).  The contention that only completed fake cards can be counted is without merit.  Under 18 U.S.C. § 1029 it is unlawful to possess unauthorized access devices, defined as "any card, plate code, or account number, ... that can be used, alone or in conjunction with another access device" to obtain a dollar figure.

It is not required that an intended loss be realistically possible.  *U.S. v. Egemonye,* 62 F.3d 425 (1st Cir.1995);  *U.S. v. Robinson,* 94 F.3d 1325 (9th Cir.1996).  Nothing in § 2F1.1 n. 7 requires that the defendant be capable of inflicting the loss he intends.  We do not agree with the language in *U.S. v. Watkins,* 994 F.2d 1192, 1196 (6th Cir.1993) and *U.S. v. Galbraith,* 20 F.3d 1054 (10th Cir.1994), stating that an intended loss cannot exceed the loss that a defendant in fact could have occasioned if his fraud had been successful.  These decisions are inconsistent with the concept the that calculation can be based on the intended loss.

The district court did not make specific findings as to the amount of loss foreseeable by Li, and he asserts that he should have been held accountable for only $169,626.  Li did not raise this issue at sentencing, and the record supports attribution of the total intended loss to Li.

Defendants are not entitled to a three-level reduction pursuant to notes 7 and 9 to 2F1.1.  The district court correctly held that § 2F1.1 did not apply since RICO conspiracy is specifically covered in the guidelines for RICO offenses.  *U.S. v. Thomas,* 8 F.3d 1552, 1564-65 (11th Cir.1993).

There is no merit to Sun's contention that the court erred by increasing his offense level by two for his role as a manager.  Sun's fingerprints appeared on the package of blank credit cards, he participated in multiple purchases of items, he drove to pick up the stamp press (the vital item in the production of false cards), he lived with ringleader Tam, and he had participated in their prior credit card fraud offense.  The district court did not err.

AFFIRMED.

BARKETT, Circuit Judge, concurring in part and dissenting in part:

I concur in affirming the conviction and sentences of all the defendants with the exception of Li Chi-Cheong.  The Supreme Court wrote in *Ybarra v. Illinois,* 444 U.S. 85, 91, 100 S.Ct. 338, 342, 62 L.Ed.2d 238 (1979) that "[w]here the standard is probable cause, a search or seizure of a

person must be supported by probable cause *particularized with respect to that person.*" (emphasis added)  Because I believe that this record does not support a conclusion that there was probable cause to arrest Li, as opposed to his companions, I would reverse his conviction and vacate his sentence.

I do not question that sufficient probable cause existed to arrest Li's companions.  Their suspicious behavior in conjunction with the signing of a false credit card receipt by one of these companions provided cause *as to them.*  The majority errs, in my view, by finding probable cause as to Li based not upon his own actions, but only upon his presence while his companions purportedly committed a crime in the absence of any record evidence that he was aware that a crime was being committed.

To support its conclusion that probable cause to arrest Li existed, the majority relies on the following:

(1) the arresting agent was "experienced in credit card fraud and had been trained by the secret service in identification of fraudulent cards";  (This is irrelevant as to Li since he did not pass or possess any fraudulent credit cards).

(2) A jeweler in Bal Harbor reported that an Asian male had attempted to make purchases with a fraudulent credit card, which had been abandoned by the suspect when the clerk attempted to verify the card;  (There was no connection to any specific Asian male and certainly not to Li).

(3) The arresting officer learned that well-dressed Asian males in small groups were defrauding high-end stores with fraudulent credit cards;  (There was no connection in the record tying Li to any known or suspected criminal activity at that time, nor any evidence in the record that he was "well-dressed" or used a credit card.  Li is indeed Asian, as are many of the shoppers in our malls.  He was also in the company of other Asian males who were shopping.  But that of course cannot serve as the sole basis for probable cause).

(4) The agent saw a videotape of four "suspicious" Asian males making credit card purchases in Saks;  (Li was not one of the people seen on the videotape).

(5) The agent observed one Asian man make a credit card purchase at another store.  At the

same time, the majority asserts, the "heavyset" man from the Saks video "sat in a chair facing the mall acting, according to [the agent] as a lookout." (There is no evidence that Li knew a fraudulent credit card was used at this time. Indeed, the agent testified that at the time that the purchase was made, Li was standing "in the other half of the store" from the register).

(6) The group proceeded to a second store and made a credit card purchase. Li was standing next to the person who signed the credit card receipt. (No evidence was presented that Li saw, or could have seen, the card before, during or after it was signed.)

(7) When the agent asked for identification, one of Li's companions produced a phony driver's license and credit cards; Li, however, did not have any credit cards and produced his own driver's license.

When we focus our particularized attention on Li as an individual, as we must, the worst that could be said of him at the time of arrest[1] is that he was associating with people who were breaking the law. There is simply no evidence to support an inference that Li *knew* that they were doing so. In *United States v. Di Re,* 332 U.S. 581, 593, 68 S.Ct. 222, 227-28, 92 L.Ed. 210 (1948), the Supreme Court, in denying the existence of probable cause, wrote:

> The argument that one who "accompanies a criminal to a crime rendezvous" cannot be assumed to be a bystander, forceful enough in some circumstances, is farfetched when the meeting is not secretive or in a suspicious hide-out, in a public street of a large city, and *where the alleged substantive crime is one which does not necessarily involve any act visibly criminal.* (emphasis added)

The Supreme Court reiterated this rule in *Ybarra,* which makes clear that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." 444 U.S. at 91, 100 S.Ct. at 342.

Additionally, in *United States v. Cortez,* 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621, the Supreme Court considered what standard a police officer must satisfy in order to make a traffic stop. The court stated that there must be a suspicion that the "*particular individual* being stopped is engaged in wrongdoing." *Id.* (Emphasis added). If particularized suspicion is required for a traffic

---

[1]Although the majority's analysis discusses subsequently discovered evidence of Li's culpability, it recognizes, as it must, that "it is not relevant to the probable cause determination."

stop, and the traffic stop standard is less stringent than the probable cause standard, then surely particularized suspicion must also be required to satisfy the more demanding test of probable cause. As *Cortez* notes, quoting *Terry v. Ohio,* 392 U.S. 1, 21 n. 18, 88 S.Ct. 1868, 1880 n. 18, 20 L.Ed.2d 889 (1968), "This demand for specificity in the information upon which the police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence." *Cortez,* 449 U.S. at 418, 101 S.Ct. at 695. *See also Sibron v. New York,* 392 U.S. 40, 62, 88 S.Ct. 1889, 1902, 20 L.Ed.2d 917 (1968) (stating that no probable cause could exist to arrest where an officer had no information concerning the defendant, saw the defendant talking to a number of known drug addicts for several hours, and could not hear what the defendant was saying to the addicts); *Davis v. Mississippi,* 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969) (dragnet detention and fingerprinting of black men fitting general description of perpetrator of crime held violative of Fourth Amendment); *United States v. Brignoni-Ponce,* 422 U.S. 873, 884, 95 S.Ct. 2574, 2582, 45 L.Ed.2d 607 (1975) ("[Border patrol] officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country."); *United States v. Martinez-Fuerte,* 428 U.S. 543, 545, 96 S.Ct. 3074, 3077, 49 L.Ed.2d 1116 (1976) (citing *Terry* for the proposition that "some quantum of individualized suspicion is usually a prerequisite to a constitutional search or seizure" but that no individualized suspicion is necessary for Border Patrol to stop and question motorists at "reasonably located checkpoints."); *Brown v. Texas,* 443 U.S. 47, 51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979) ("the Fourth Amendment requires that a seizure must [either] be based on specific, objective facts indicating that society's legitimate interests require the seizure of the particular person" or be performed pursuant to a plan embodying neutral limitations); *Delaware v. Prouse,* 440 U.S. 648, 662, 99 S.Ct. 1391, 1400-01, 59 L.Ed.2d 660 (1979) (stating that regulatory inspections, when not undertaken pursuant to previously specified neutral criteria, must be accompanied by individualized, articulable suspicion.). *See also I.N.S. v. Delgado,* 466 U.S. 210, 233, 104 S.Ct. 1758, 1771, 80 L.Ed.2d 247 (1984) (Brennan, J., dissenting) ("This requirement of particularized suspicion provides the chief protection of lawful citizens against

unwarranted governmental interference with their personal security and privacy.").

Under the majority's analysis, shopping with someone who unbeknownst to her or his companions was shoplifting would be sufficient probable cause to arrest. I do not believe the majority's approach comports with the law of probable cause, and, accordingly, dissent.