[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 07-10964

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCT 17, 2008
THOMAS K. KAHN
CLERK

D. C. Docket No. 05-00481-CR-T-23-EAJ

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

OLGA LEZCANO,
IRENO LUIS DELGADO,
a.k.a. Ireno Luis,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

**(October 17, 2008)**

Before BLACK, PRYOR and COX, Circuit Judges.

PER CURIAM:

Olga Lezcano was found guilty after a jury trial of: (1) one count of conspiracy to commit mail fraud, in violation of 18 U.S.C. § 371; and (2) one count of mail fraud, in violation of 18 U.S.C. §§ 1341 and 2. Ireno Luis Delgado was found guilty after a jury trial of: (1) one count of conspiracy to commit mail fraud, in violation of 18 U.S.C. § 371; and (2) four counts of mail fraud, in violation of 18 U.S.C. §§ 1341 and 2. Lezcano appeals her convictions, asserting one claim of error.[1] Delgado appeals both his convictions and 41-month sentence, asserting six issues on appeal.[2] We address each of their issues in turn, and affirm both Lezcano's and Delgado's convictions and sentences.

## I. OLGA LEZCANO

Lezcano asserts the district court abused its discretion when it overruled her objection to the Government calling Bridgette Cusic as a rebuttal witness.

---

[1] Lezcano also attempts to adopt three of Delgado's arguments on appeal–entrapment, sufficiency of the evidence, and pretrial restraint of substitute assets. All three of these arguments are fact-specific to Delgado, however, and Lezcano's "attempt to adopt [Delgado's] arguments by a passing reference 'does not adequately develop or preserve the issue[s] with respect to [her] own appeal.'" *United States v. Castro-Lara*, 970 F.2d 976, 982 (1st Cir. 1992) (citation omitted).

[2] One of Delgado's arguments is that the district court abused its discretion in permitting the pretrial restraint of substitute assets. Following the verdict, the Government notified the district court it was not seeking to forfeit Delgado's property, moved to dismiss the pretrial restraining order against Delgado's property, and sought and obtained a final forfeiture money judgment against Delgado. Accordingly, Delgado's contentions regarding the district court's pretrial restraint of his property are moot. *See United States v. Ripinsky*, 20 F.3d 359, 363 (9th Cir. 1994) (concluding question of whether the government can restrain pretrial assets remains live until the judgment of conviction is entered).

2

Lezcano contends the Government did not list Cusic on its witness list, and did not call Cusic during its case-in-chief. She argues the Government's failure to present Cusic in its case-in-chief afforded the Government an improper second bite at the apple in rebuttal, citing *Faigin v. Kelly*, 184 F.3d 67, 86 (1st Cir. 1999).

The district court's decision whether to permit rebuttal testimony is reviewed for an abuse of discretion. *See United States v. Frazier*, 387 F.3d 1244, 1269 (11th Cir. 2004) (en banc). "The purpose of rebuttal evidence is 'to explain, repel, counteract, or disprove the evidence of the adverse party,' and the decision to permit rebuttal testimony is one that resides in the sound discretion of the trial judge." *Id.* (quoting *United States v. Gold*, 743 F.2d 800, 818 (11th Cir. 1984)).

In *Faigin*, the First Circuit upheld the district court's refusal to allow a litigant to present rebuttal testimony. The First Circuit found the district court did not abuse its discretion because when a party knows that a contested matter is in the case, yet fails to address it in a timely fashion, he cannot be heard to complain the trial court refused to give him a second nibble at the cherry. *Faigin*, 184 F.3d at 85.

The Government presented testimony from Carlos Figueredo-Lopez and Agent Gricel Sass during its case-in-chief that Figueredo-Lopez was alone in his car when he was in an accident with Cusic on March 1, 2001. During the defense

3

case, Lezcano presented two witnesses to respond to this evidence: Mercedes Figueredo and Janette Lopez-DeBonano. Unlike *Faigin*, this was not a case of the Government presenting evidence it should have presented during its case-in-chief. The Government presented witnesses during its case-in-chief, and when Lezcano's witnesses told a different story, the Government was entitled "to explain, repel, counteract, or disprove the evidence" of Lezcano that she was involved in the accident. *See Frazier*, 387 F.3d at 1269. The district court did not abuse its discretion in allowing Cusic's rebuttal testimony, and we affirm Lezcano's conviction and sentence.

## II. IRENO LUIS DELGADO

### A. Entrapment

Delgado asserts the district court erred in denying his motion for judgment of acquittal because he was able to show he was enticed to commit the offenses through the persistent behavior of the FBI. Delgado contends that once he presented evidence of Government inducement, the Government had the burden of proving beyond a reasonable doubt that Delgado was predisposed to commit the charge offenses. He asserts the Government failed to prove predisposition, and thus no reasonable jury could have found he was predisposed to commit the charged offenses before the Government inducement began.

4

Entrapment is a jury question, thus entrapment as a matter of law is a sufficiency of the evidence inquiry. *United States v. Brown*, 43 F.3d 618, 622 (11th Cir. 1995). "When an entrapment defense is rejected by the jury, our review is limited to deciding whether the evidence was sufficient for a reasonable jury to conclude that the defendant was predisposed to take part in the illicit transaction." *Id.* "Review is *de novo*, but we must view all facts and make all inferences in favor of the government." *Id.*

"In their zeal to enforce the law . . . Government agents may not originate a criminal design, implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so that the Government may prosecute." *Jacobson v. United States*, 503 U.S. 540, 548, 112 S. Ct. 1535, 1540 (1992). In *Jacobson*, the Supreme Court reversed the Eighth Circuit's holding that the defendant was not entrapped as a matter of law, finding that although the defendant had been predisposed to break the law, the prosecution did not prove that such predisposition was independent and not the product of the attention the Government had directed at the defendant for 26 months. By the time the defendant ordered child pornography, he had been the target of 26 months of repeated mailings and communications from Government agents and fictitious organizations. *Id.* at 550, 112 S. Ct. at 1541.

5

Contrary to Delgado's assertion that "[t]he Government failed to show any pre-investigation evidence of predisposition," Sass testified that she believed Delgado spoke about previous staged accidents, and throughout the course of the investigation, Delgado told Agent Sass about staged accidents he was helping to set up or had already participated in, separate and apart from any activity with Trident Venture Group (TVG). Additionally, from Sass's earliest conversations with Delgado, Delgado hinted he would be amenable to participating in fraudulent activity. He told Sass that (1) in Costa Rica, no one asks questions about monetary transactions; (2) in 1998, he earned $2 million without committing a fraud; (3) he did not care what kind of patients she referred him as long as they had PIP insurance; and (4) Tampa was "very hot" because of recent arrests in the area for insurance fraud. Moreover, once Sass told Delgado outright that TVG only dealt with staged accident participants, he showed no reluctance to deal with TVG. Instead, he continued to want to work with TVG.

Later, Delgado introduced Sass to Jose Cardenas as a person who could help TVG find participants for staged accidents and offered Cardenas's yard as a place where agents could "smash up" accident vehicles. He further introduced Sass to people who were willing to participate in staged accidents. He also consulted with agents regarding the types of insurance polices that staged accident participants

6

should carry, encouraging TVG to only work with those with high limits.  He told agents the amount he was willing to pay them to refer staged accident participants to his clinics.

This evidence makes Delgado's case very different from *Jacobson*, so his comparison of his situation to that case is without merit.  *Jacobson*, 503 U.S. at 550, 112 S. Ct. at 1541.  Based on the above recited facts, the evidence was sufficient for a reasonable jury to conclude that the defendant was predisposed to take part in staging accidents and fraudulently collect insurance proceeds.  *Brown*, 43 F.3d at 622.  Delgado's entrapment argument is without merit.

B.  *Testimony containing conversations of co-conspirators*

Delgado asserts that throughout the testimony of Agent William Jones and Sass, the Government elicited hearsay statements from alleged co-conspirators Jose Cardenas and Emanuel Mellon that served only to mislead the jury and prejudice Delgado.  He asserts the Government also denied him the right to cross-examine the out-of-court co-conspirators.

"We review evidentiary rulings for an abuse of discretion."  *U.S. v. $125,938.62*, 537 F.3d 1287, 1292 (11th Cir. 2008).  "Co-conspirator statements are admissible [under Fed. R. Evid. 801(d)(2)(E)] so long as the conspiracy existed, the declarant and the defendant were involved in the conspiracy, and the

7

statement was made in furtherance of the conspiracy." *United States v. Tokars*, 95 F.3d 1520, 1538 (11th Cir. 1996). "We review the district court's factual determinations that the conspiracy existed and that the statement was made in furtherance of that conspiracy under the clearly erroneous standard." *Id.* "[T]he conspiracy that forms the basis for admitting a co-conspirator's out of court statements need not be the same conspiracy for which the defendant is charged." *United States v. Bowe*, 221 F.3d 1183, 1193 (11th Cir. 2000). Additionally, this Circuit applies a liberal standard in determining whether a statement was made in furtherance of the conspiracy–the statement need not be necessary to the conspiracy, but must further the conspiracy in some way. *United States v. Turner*, 871 F.2d 1574, 1581 (11th Cir. 1989).

Although neither Cardenas nor Mellon were charged in this case, there was ample evidence that a conspiracy existed between Delgado and Cardenas and Delgado and Mellon. Additionally, there was ample evidence the statements were made in furtherance of the conspiracy.

### 1. Cardenas

Delgado told the agents he had a friend, Cardenas, who had brought several patients to the clinic and that Delgado would introduce the agents to Cardenas. Delgado told Sass he paid Cardenas for referrals and repeatedly told Sass that she

8

should talk to Cardenas if she needed people to use in future staged accidents. Later, Sass met Cardenas and they expected to work together in the future. In one conversation between Sass, Cardenas, and Delgado, Cardenas agreed to help Sass find participants for staged accidents, and Delgado volunteered Cardenas's yard to "smash up" vehicles. Delgado and Cardenas then began discussing an accident they were in the process of staging for which Cardenas was finding an at-fault driver. Delgado told Cardenas to let him know as soon as he had found a driver so he could have the driver and participants ready. At another point, Delgado again said he was in the process of staging another accident with Cardenas. Considering this evidence, the district court did not clearly err in determining Delgado and Cardenas were involved in a conspiracy. *See Tokars*, 95 F.3d at 1538.

Delgado challenges Cardenas's statement regarding setting up a yard to damage the cars. The district court did not clearly err in determining this was a statement made in furtherance of the conspiracy. Thus, this was an admissible co-conspirator statement under Fed. R. Evid. 801(d)(2)(E). *See Tokars*, 95 F.3d at 1538.

*2. Mellon*

Sass introduced Delgado to Mellon. Mellon came to TVG, purporting to be an organizer of staged accidents. Sass then summoned Mellon to Delgado's

9

office, where Mellon asked Delgado how much he would be paid for each patient he referred to Delgado. Delgado agreed to pay Mellon $800 for each patient referred–$400 for the patient and $400 for Mellon.

On November 15, 2000, Delgado told Sass a staged accident would occur later that day or the next day. As predicted, a staged accident Mellon had planned occurred later that day. Sass told Delgado that four participants had pretended to be in an accident with a "phantom" vehicle. Mellon said he would bring the participants to Delgado's clinic for treatment. Delgado later told the agents he had paid Mellon $2000 for the participants in the staged accident who had come to his clinic and he planned to pay Mellon $2000 more. Delgado later told Sass he paid Mellon $1000 for each patient who had participated in the November 15 accident, but that he was having problems with the patients. Over the next several weeks, Delgado continuously complained to Sass about the patients Mellon had sent him, telling her that some had stopped coming for treatment even though he paid them. He said that although Mellon had promised to fix the situation, he could not find Mellon. On March 22, 2001, Sass met with Mellon and Delgado to discuss the patients Mellon had brought to Delgado. Mellon told Delgado he had been gone for so long because he had been in Haiti and had difficulty returning to the United States. Delgado told Mellon that Mellon owed Delgado money, but Mellon

10

instead offered to bring Delgado more patients. Delgado then told Mellon the insurance policy limits he would like to see for patients that Mellon brought him in the future. Considering this evidence, the district court did not clearly err in finding that Mellon and Delgado were involved in a conspiracy. *See Tokars*, 95 F.3d at 1538.

The statements Delgado challenged were also made in furtherance of the conspiracy: they concerned Mellon bringing patients to Delgado's clinic; the price to be paid for the patients; and the planning of a future accident. Thus, the district court did not clearly err in finding the statements were made in furtherance of the conspiracy and these were admissible co-conspirator statements under Fed. R. Evid. 801(d)(2)(E). *See Tokars*, 95 F.3d at 1538.

In conclusion, the district court did not abuse its discretion in admitting these co-conspirator statements.

*C. Sufficiency of evidence*

Delgado attacks both his conspiracy to commit mail fraud and mail fraud convictions, alleging there was insufficient evidence to convict him of these offenses. "We review the sufficiency of the evidence de novo and view the evidence in the light most favorable to the government with all reasonable inferences and credibility choices made in favor of the government to determine

11

whether a reasonable jury could convict." *United States v. Campa*, 529 F.3d 980, 992 (11th Cir. 2008).

### 1. Conspiracy

As to the conspiracy count, Delgado asserts all the Government could prove was that there were multiple conspiracies, and asserts that *United States v. Coy*, 19 F.3d 629, 632-35 (11th Cir. 1994), stands for the proposition there could be a substantial prejudice to a defendant when there are so many defendants in separate conspiracies before the jury that there is a substantial likelihood the jury can transfer proof of one conspiracy to a defendant involved in another conspiracy. Thus, he asserts there was a prejudicial variance between the indictment, which charged a single conspiracy, and the proof at trial, which he contends established multiple conspiracies, as all of the co-conspirators were involved for different purposes, and some of the co-conspirators never met. He asserts no reasonable jury could have found a single conspiracy existed.

"We do not reverse convictions because a single conspiracy is charged in the indictment while multiple conspiracies may have been revealed at trial unless the variance is material *and* substantially prejudiced the defendants." *United States v. Alred*, 144 F.3d 1405, 1414 (11th Cir. 1998). "To decide whether the jury could have found a single conspiracy, we review (1) whether a common goal

12

existed; (2) the nature of the underlying scheme; and (3) the overlap of participants." *Id.*

The evidence in this case showed a connection between the conspirators and their activities, with the common purpose of defrauding insurance companies out of policy proceeds. "It is irrelevant that particular conspirators may not have known other conspirators or participated in every part of the conspiracy; all that the government must prove to establish conspiracy liability is an agreement or common purpose to violate the law and intentional joining in this goal by the coconspirators." *Id.* Here, that is exactly what happened–although all of the participants may not have known each other and had different purposes–it is of no moment because the co-conspirators were in the scheme for a common purpose, to defraud insurance companies by staging accidents. Thus, a reasonable trier of fact could have found a single conspiracy existed beyond a reasonable doubt. *See id.* As there is no variance between the indictment and the evidence, we need not decide whether Delgado was substantially prejudiced by the variance. *See id.*

Also as to the conspiracy count, Delgado summarily argues the Government did not prove an overt act. To prove a conspiracy under 18 U.S.C. § 371, the evidence must show (1) an agreement among two or more persons to achieve an unlawful objective; (2) the defendant's knowing and voluntary participation in the

13

agreement; and (3) an overt act in furtherance of the agreement. *United States v. Hasson*, 333 F.3d 1264, 1270 (11th Cir. 2003). We conclude a reasonable jury could have found Delgado committed any of the overt acts alleged in the indictment. Thus, the evidence was sufficient to convict Delgado of conspiracy to commit mail fraud.

### 2. *Mail fraud*

As to the mail fraud counts, Delgado asserts there was either no proof of any actual mailing, or there was a discrepancy as to when the items were mailed. "For purposes of the mail fraud statute, one causes the mails to be used when one commits an act with knowledge that the use of the mails will follow in the ordinary course of business, or where one can reasonably foresee such use, even though it may not actually be intended." *United States v. O'Malley*, 707 F.2d 1240, 1246 (11th Cir. 1983).

The jury in this case could reasonably find the use of the mail in this case followed the ordinary course of business or that Delgado could have reasonably foreseen that insurance claim forms for the participants would be mailed to insurance companies. The district court admitted into evidence numerous healthcare claim forms that Delgado's clinic had mailed to various insurance companies. The records included the postmarked envelopes in which the claim

14

forms had been mailed. This evidence was sufficient to convict Delgado of mail fraud.

*D. Admitting insurance records into evidence*

Delgado asserts the district court abused its discretion in admitting certain insurance records and the summary graphs of those records because they were irrelevant and any minimal probative value the records had was substantially outweighed by the danger of unfair prejudice. Fed. R. Evid. 402, 403. He further claims their admission violated *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354 (2004), because none of the records custodians ever testified, the Government did not demonstrate they were unavailable to testify at trial, and Delgado did not have any prior opportunity to cross-examine them.

"We review evidentiary rulings for an abuse of discretion." *U.S. v. $125,938.62*, 537 F.3d 1287, 1292 (11th Cir. 2008). The district court admitted these records pursuant to Fed. R. Evid. 803(6) and 902(11). Rule 803(6) allows admission of business records "if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business to make the . . . record." Rule 902(11) permits a party to authenticate business records with a written declaration of a records custodian or other qualified person, as long as the party provides notice of intention to the adverse party, and makes the record and

15

declaration available for inspection sufficiently in advance of their offer into evidence. The Government complied with Rule 902(11) in admitting the business records as it gave Delgado notice and gave him an opportunity to inspect the records. Thus, Delgado's argument these records were admitted improperly because there was no one from the insurance company to explain the relevance is meritless.

Delgado's arguments that these insurance records did not have any tendency to make any fact in issue more probable or less probable and that they were prejudicial are meritless. Because Delgado was defrauding the insurance company, the insurance company records are, of course, relevant and had probative value. Thus, the probative value was not outweighed by the danger of unfair prejudice. *See* Fed. R. Evid. 402, 403.

Delgado asserts the summary graphs provided by the Government were unreliable and the district court should have required the Government to produce the front and back of each and every check documenting the claims paid by each company. Fed. R. Evid. 1006 provides the contents of voluminous records which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals or duplicates shall be made available for

16

examination or copying by the parties at a reasonable time and place. The district court may order they be produced in court. Fed. R. Evid. 1006.

Although the documents underlying a summary exhibit must be made available to the defendant for examination, Rule 1006 leaves it to the district court's discretion whether the proponent of the summary must produce the underlying documents in the courtroom. Here, the district court did not require the Government to produce the underlying documents, although many of the documents on which Agent Brynjolfsson relied were admitted into evidence in Government Exhibits 41 through 47. Further, Delgado examined Brynjolfsson regarding the basis for the information he included in his summaries. The district court also instructed the jury, in regard to the summaries, that the summary charts, and the accompanying summary testimony of Brynjolfsson had been admitted not as proof of any fact but as a "means of more simply and quickly presenting and explaining some other more lengthy or voluminous evidence in the case. In other words, charts or summaries are used only as a matter of convenience. If they lack a sound foundation elsewhere in the evidence or inaccurately summarize the facts or figures shown elsewhere by the evidence, you should disregard them to that extent." Given that much of the underlying foundation for the summaries was admitted into evidence, and the judge's limiting instruction on the evidentiary

value of the summaries, it was not an abuse of discretion for the district judge to admit the summaries.

Finally, Delgado asserts the admission of the business records without an accompanying records custodian testifying violated *Crawford*. This argument is meritless. *Crawford* applies only to testimonial statements, and in giving examples of "statements that by their nature were not testimonial[,]" and, thus, not subject to Confrontation Clause scrutiny, the *Crawford* Court identified business records. *Crawford*, 541 U.S. at 56, 124 S. Ct. at 1378.

In conclusion, the district court did not abuse its discretion in admitting the business records or summaries. As this is Delgado's last issue regarding his convictions, we affirm his convictions.

*E. Loss amount*

Delgado asserts the district court clearly erred when it determined the amount of loss for the purposes of applying U.S.S.G. § 2F1.1(b)(1). Specifically, he asserts the district court erred by using the amounts billed by other clinics not charged in the conspiracy to determine the amount of loss; using the amount billed instead of the insurance policy limits because Delgado could not have intended to receive any amount more than what the insurance companies were legally obligated to pay; using business records that did not have a records custodian to

18

calculate the amount of loss; using a loss figure that included bodily injury loss, not just PIP because he intended and had the ability to inflict only PIP loss; and including the conduct of others who were not his co-conspirators. Finally, Delgado asserts that due to the imprecise nature of the business records and the summation of those records, the district court should have used the actual loss as the amount of loss.[3]

The district court's calculation of the amount of loss is a factual determination we review for clear error. *United States v. Toussaint*, 84 F.3d 1406, 1407 (11th Cir. 1996). When an argument is raised for the first time on appeal, it is reviewed for plain error. *United States v. Rodriguez*, 398 F.3d 1291, 1298 (11th Cir. 2005).

Under U.S.S.G. § 2F1.1(b)(1)(K) (2000), an offense level is increased by 10 levels if the loss is more than $500,000, but not more than $800,000. Under § 2F1.1, the offense level is based upon the greater of the actual loss or the intended loss. *United States v. Hedges*, 175 F.3d 1312, 1316 (11th Cir. 1999).

---

[3] Delgado also asserts the district court erred by including the interest paid on claims, costs, and legal fees in the amount of loss. This argument is meritless as the district court did not include these amounts in the amount of loss.

*1. Net Gain and Co-conspirators*

The calculation of a loss is not an exact science, and the district court's "reasonable estimate of the intended loss will be upheld." U.S.S.G. § 2F1.1 comment. (n.9) (2000); *United States v. Dabbs*, 134 F.3d 1071, 1081-82 (11th Cir. 1998). "Moreover, the district court may hold all participants in a conspiracy responsible for the losses resulting from the reasonably foreseeable acts of co-conspirators in furtherance of the conspiracy." *Dabbs*, 134 F.3d at 1082.

Under U.S.S.G. § 1B1.3, the sentencing court should consider all relevant conduct when calculating a defendant's offense level. *United States v. Hamaker*, 455 F.3d 1316, 1336 (11th Cir. 2006). "Relevant conduct includes acts that were part of the same course of conduct or common scheme or plan as the offense of conviction." *United States v. Pham*, 463 F.3d 1239, 1246 (11th Cir. 2006). To determine under § 1B1.3 whether the conduct of others is attributable to the defendant, the court must find the conduct was in furtherance of the jointly undertaken criminal activity, and reasonably foreseeable in connection with that criminal activity. U.S.S.G. § 1B1.2 comment. (n.2).

Delgado's argument the loss should be limited to his net gain from the conspiracy is without merit. *Hamaker*, 455 F.3d at 1336. The losses attributed to Delgado were from the staged accidents in which he participated. Additionally,

Delgado is criminally responsible for the losses his co-conspirators created. *Dabbs*, 134 F.3d at 1082. The participants in the staged accidents were Delgado's co-conspirators, and it was reasonably foreseeable they would make fraudulent claims, even if they did not make them with the full aid of Delgado. *See United States v. Padron*, 527 F.3d 1156 (11th Cir. 2008) (holding it was reasonably foreseeable for participants in a staged accident to make insurance claims). Thus, Delgado should be criminally responsible for the entire loss cause by each staged accident in which he participated. Accordingly, the district court did not clearly err when it did not limit the loss attributable to Delgado to his net gain from the scheme.

### 2. *Intended loss*

"It is not required that an intended loss be realistically possible." *United States v. Wai-Keung*, 115 F.3d 874, 877 (11th Cir. 1997). A defendant is criminally responsible for the loss he intends, even if he is not capable of inflicting that amount of loss. *Id.*

As an initial matter, the district court did not err by using intended loss rather than actual loss for its calculation because intended loss was the greater of the two figures. *See Hedges*, 175 F.3d at 1316. As to the calculation of the intended loss amount, it is unclear whether Delgado is arguing the economic

21

reality was that the intended loss cannot be more than the policy limits of the insurance policies, or that his subjective intent was to defraud the insurance companies of the policy limits and no more, or if he is making both arguments. Delgado did not make either of these arguments before the district court, and both should be reviewed under the plain error standard. *See Rodriguez*, 398 F.3d at 1298.

Delgado's argument his subjective intent does not matter because the economic reality is that the insurance companies would not have paid more than policy limits is without merit. In *Wai-Keung*, we held the amount of intended loss did not need to be realistically possible and specifically rejected the language of other circuits stating "that an intended loss cannot exceed the loss that a defendant in fact could have occasioned if his fraud had been successful." *Wai-Keung*, 115 F.3d at 877. Thus, as to the economic reality argument, the district court did not commit an error, much less a plain error.

Delgado also appears to argue his subjective intent was to defraud the insurance companies of no more than policy limits, and that argument is also without merit as Delgado points to no evidence in the record showing what his subjective intent might have been, and the district court could not have assumed it. Thus, Delgado has not carried his burden to show plain error.

22

*3. Evidence of intended loss*

We have already determined the district court did not abuse its discretion in admitting business records during trial. Those business records were ultimately relied upon to come to the loss amount. Even if they were inadmissible hearsay, the district court may consider hearsay during sentencing. *See United States v. Query*, 928 F.2d 383, 384-85 (11th Cir. 1991). Delgado submitted his own calculations for the loss as evidence at the sentencing hearing, and was given the chance to cast doubt upon the records during his *voir dire* of Brynjolfsson. Delgado has not explained why the district court should not have relied upon the figures from the insurance companies and summarized by Brynjolfsson. Thus, Delgado has not shown the district court clearly erred by relying on one set of figures over another.

In conclusion of this issue, the district court did not clearly err by including the losses created by Delgado's co-conspirators, using the amounts billed to the insurance companies as an estimation of the intended loss, or relying on the figures compiled by the FBI. Thus, we affirm Delgado's sentence.

**AFFIRMED.**