[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-12134
Non-Argument Calendar
_____

D.C. Docket No. 2:13-cr-00082-LSC-TMP-5


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CLIFFTON S. MORMON,
a.k.a. Kurt,
a.k.a. Curt,
a.k.a. Tippy,
a.k.a. Tip,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(March 13, 2015)

Before HULL, WILLIAM PRYOR and ROSENBAUM, Circuit Judges.

PER CURIAM:

Cliffton Mormon appeals his sentence of 95 months of imprisonment for one count of conspiring to commit bank fraud, 18 U.S.C. § 1349, and two counts of aiding and abetting aggravated identity theft, *id.* §§ 1028A, 2. Mormon challenges the enhancement of his sentence for being an organizer or leader of a conspiracy to cash counterfeit checks; for an amount of loss exceeding $120,000; for having 50 or more victims; and for using sophisticated means or, alternatively, for relocating to evade law enforcement. Mormon also challenges, for the first time, the requirement that he complete 24 hours of community service by washing dishes at a soup kitchen or similar facility as a special condition of his supervised release. We affirm the special condition of Mormon's supervised release and all except one enhancement applied to Mormon. Because the record does not support the finding that Mormon's offense involved 50 victims, we vacate his sentence and remand for the district court to resentence Mormon using the two-level enhancement applied to an offense involving 10 or more victims.

The district court did not clearly err in finding that Mormon was an organizer or leader of the conspiracy. A defendant is subject to a four-level enhancement of his offense level if he was "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive," United

2

States Sentencing Guidelines Manual § 3B1.1(a) (Nov. 2013), and if he exercised authority over "one or more other participants," *id.* § 3B1.1 cmt. n.2. The factual proffer for Mormon's pleas of guilty and the testimony at sentencing from John Bailey, an agent of the United States Postal Inspection Service, established that Mormon recruited a person to provide insider information about banking operations and that Mormon directed a counterfeit check-cashing operation that involved several persons. *See id.* § 3B1.1 cmt. n.4. Mormon persuaded his girlfriend, an employee of Regions Bank, to join the conspiracy and directed her to provide information about bank procedures, to access bank databases to determine which accounts at different banks to pilfer, and to print images of checks to counterfeit. Mormon also moved from Atlanta, Georgia, where the headquarters of the conspiracy was located, to Birmingham, Alabama, to supervise local operations; he produced counterfeit checks in his hotel room but conducted meetings at a coconspirator's residence; he supervised coconspirators who recruited persons to cash the counterfeit checks; and he performed surveillance when the recruits entered banks to cash the counterfeit checks. The evidence supports the finding that Mormon orchestrated the activities of the Birmingham counterfeiting operation.

The district court also did not clearly err in finding that the amount of loss attributable to Mormon exceeded $120,000. A defendant is responsible for

3

monetary losses that he causes and that result from the reasonably foreseeable acts of his coconspirators in furtherance of the conspiracy, *id.* §§ 1B1.3(a)(1), 2B1.1 cmt n.3. When the monetary losses exceed $120,000, the defendant is subject to a ten-level enhancement of his offense level. *Id.* § 2B1.1(b)(1)(F). Evidence introduced during Mormon's change of plea and sentencing hearings established that officers in southern Georgia found Mormon in possession of check stock paper; stolen checks; partially completed and stubbed counterfeit checks connected to 27 business bank accounts; a computer containing check-writing software and data entries showing that $84,000 in checks had been printed; and 24 images of checks that each had a face value exceeding $1,000. The district court reasonably considered the value of the images of the checks and Mormon's production capabilities to determine the amount of loss. *See United States v. Grant*, 431 F.3d 760, 765 (11th Cir. 2005); *United States v. Wai-Keung*, 115 F.3d 874, 877 (11th Cir. 1997). The district court also reasonably attributed to Mormon the value of counterfeit checks that his known coconspirators negotiated using stolen account information, some of which was discovered in Mormon's hotel room and some of which corresponded to accounts located by his girlfriend. *See United States v. Baldwin*, 774 F.3d 711, 727–28 (11th Cir. 2014). Mormon's coconspirators cashed $29,504 in counterfeit checks and attempted to cash more checks valuing $42,622 at a Regions Bank; cashed $43,104 in counterfeit checks and attempted to cash

4

more checks valuing $58,081 at a Wells Fargo Bank; and cashed one counterfeit check for $1,981.37 and attempted to cash a second check for $1,393.75 at a BBVA Compass Bank. The value of the check images and of the checks that Mormon's coconspirators negotiated or attempted to negotiate exceed $120,000.

The district court clearly erred when it found that Mormon's victims numbered at least 50. "[I]n a case involving a means of identification," "any individual whose means of identification was used unlawfully or without authority" is a "victim." U.S.S.G. § 2B1.1 cmt. n.4(E). If there are 50 or more victims, a defendant is subject to a four-level increase in his offense level, *id.* § 2B1.1(b)(2)(B), but a two-level increase applies to an offense involving 10 or more victims, id. § 2B1.1(b)(2)(A). Mormon acknowledges that he "used" the means of identification of 3 banks and 18 account holders. Investigator Bailey testified that officers seized from Mormon a box containing 24 images of checks from different accounts, but the investigator testified that only two of those images were used to create "partially-completed counterfeit checks." *See United States v. Hall*, 704 F.3d 1317, 1322 (11th Cir. 2013). Although Investigator Bailey testified that he and his team "reviewed hundreds of checks that were passed" by the conspiracy, the record is devoid of evidence that those checks were created using the means of identification of more than one individual or that those checks involved a victim different than those admitted to by Mormon. The government is

required to introduce "sufficient and reliable" evidence to identify the victims of an offense, *see United States v. Washington*, 714 F.3d 1358, 1361 (11th Cir. 2013), and that is particularly important in a case like this where the conspirators cashed several checks against the same accounts multiple times. Because the government identified, at most, 23 victims, the district court must resentence Mormon using the two-level enhancement applied to an offense involving 10 or more victims.

Even if we were to assume that Mormon is not subject to a two-level increase in his base offense level for relocating the check-cashing operation to evade law enforcement officials, *see* U.S.S.G. § 2B1.1(b)(10)(A), the district court did not clearly err when it enhanced Mormon's offense level on the alternative ground that he used sophisticated means, *see id.* § 2B1.1(b)(10)(C). Mormon used especially complex or intricate conduct to execute the scheme and to conceal the counterfeit operation and his involvement in the operations. *Id.* § 2B1.1 cmt. n.9(B); *see United States v. Ghertler*, 605 F.3d 1256, 1267–68 (11th Cir. 2010). He determined which bank accounts to target and how much money to draw using confidential information that his girlfriend acquired about the check numbers and their amounts that had cleared to ensure that the counterfeit checks matched the pattern of activity of the accounts. Mormon also acquired images of real checks from which he copied account and routing numbers and other information that he used to create counterfeit checks of sufficient quality that they were accepted by

banks. And Mormon had coconspirators recruit persons to cash the checks; he concealed his identity and his base of operations from those recruits; and the recruits were ordinarily homeless or transient persons who were difficult to trace and were easily enticed to serve on a temporary basis in exchange for money or other things of value. The district court was entitled to find that Mormon's scheme was sophisticated.

The district court did not plainly err by ordering Mormon to complete 24 hours of community service by washing dishes at a soup kitchen or similar facility during his supervised release. "Community service may be imposed as a condition of supervised release," U.S.S.G. § 5D1.3(e)(3); *see also id.* § 5F1.3, and the district court reasonably determined that requiring Mormon to wash dishes enabled him to use that past employment to benefit others who were less privileged while teaching him the value of honest employment, *see* 18 U.S.C. §§ 3583(d)(1), 3553(a). The district court found that Mormon's fraud "demonstrate[d] an absolute callous disregard for [the] law, for people's rights, [and] for the interest of others," and the district court reasonably could have determined that Morman could best make amends by serving the persons whom he enticed to engage in criminal activities for his financial gain. Mormon argues that his term of community service involves a "greater deprivation of liberty than is reasonably necessary" to achieve the statutory goals of sentencing, *id.* § 3583(d)(2), but the condition that Mormon

7

serve for "four hours per week for six weeks" is far below the maximum term of community service recommended by the advisory guidelines. *See* U.S.S.G. § 5F1.3 cmt. n.1. "[T]here can be no plain error where there is no precedent from the Supreme Court or this Court directly resolving it," *United States v. Lejarde-Rada*, 319 F.3d 1288, 1291 (11th Cir. 2003), and Mormon fails to cite any precedent holding that community service in the form of washing dishes for the length of one day is an excessive deprivation of liberty.

We **AFFIRM** the special condition of Mormon's supervised release and the enhancement of his sentence for being an organizer or leader of a conspiracy to cash counterfeit checks, for causing a loss of more than $120,000, and for his use of sophisticated means. But because the record does not support the finding that Mormon's offense involved 50 victims, we **VACATE** his sentence and **REMAND** for the district court to resentence Mormon using the two-level enhancement applied to an offense involving 10 or more victims.